UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LUKE ALLAN G., <br><br>                      Plaintiff, <br><br>       vs. <br><br> ANDREW SAUL, Commissioner of the Social Security Administration, <br><br>                    Defendant. | 4:20-CV-04046-VLD <br><br><br> MEMORANDUM OPINION <br> AND ORDER |

## INTRODUCTION

Plaintiff, Luke Allan G., seeks judicial review of the Commissioner's final decision denying his application for social security disability benefits under Title II of the Social Security Act.[1]

Mr. G. has filed a complaint and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

---

[1] Social Security Disability/Disability Insurance Benefits (SSD/DIB) are called "Title II" benefits. Receipt of Title II benefits is dependent upon whether the claimant is disabled. Mr. G.'s coverage status for SSD/DIB benefits expires on December 13, 2021. AR12. In other words, in order to be entitled to Title II benefits, Mr. G. must prove disability on or before that date.

## A.    Procedural History

On October 14, 2016, Luke Allan G. filed a Title II application for social security disability benefits, alleging a disability onset date of September 11, 2016.  AR11.[3]  He was 24 years old as of his alleged onset date.  Id.

On June 14, 2018, Brenda Rosten, Administrative Law Judge, held a video hearing.  AR175-232.  Mr. G. and Thomas Audet, a vocational expert, testified at the hearing.  Id.

At the conclusion of the hearing, ALJ Rosten announced her intention to order a physical consultative examination and possibly a psychological examination as well.  AR222, 229.  She explained that once the results of the consultative examination(s) were available, she would be open to holding a supplemental hearing and instructed Mr. G.'s attorney to contact her to make those arrangements.  AR222-23, 229-30.  The ALJ also left the record open to permit Mr. G. to submit additional written statements.  AR230.  Finally, the ALJ stated that, depending on the results of the consultative examinations, she would be allowed supplemental interrogatories to the vocational expert.  AR227.

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 32).  Unless otherwise noted, the court has made only minor grammatical and stylistic changes.

[3] Citations to the appeal record will be cited as "AR" followed by page number or numbers.

In July 2018, Mr. G.'s attorney supplemented the record with a medical source statement from Jason Sibson, Psy.D. AR3642-43.

Mr. G. appeared for physical and psychological consultative examinations on August 7 and 8, 2018. AR3648-72.

In letters dated September 17 and September 26, 2018, ALJ Rosten notified Mr. G.'s attorney that she was adding additional exhibits to the record, including the results of the consultative examinations and Dr. Sibson's medical source statement. AR467-68, 470-71. The letters explained that Mr. G. could submit written comments about the evidence, a written statement as to the facts and law believed to apply to the case, additional records, and written questions to be sent to the authors of the reports in question. AR467, 470. In addition, the letters informed Mr. G.'s attorney that he could request a supplemental hearing. Id.

On September 27, 2018, Mr. G.'s attorney responded, stating that he did not object to the additional exhibits. AR474. He also supplemented the record with an RFC opinion from Dr. Sibson. AR3673-75. Finally, he included an argument that Mr. G. met listing 12.04 for bipolar disorder. AR474. He did not request either a supplemental hearing or an opportunity to submit additional interrogatories to the vocational expert. Id.

On January 8, 2019, ALJ Rosten issued an unfavorable decision. AR11-38. Mr. G. requested review of the decision by the Appeals Council. AR289-90. On January 14, 2020, the Appeals Council denied Mr. G.'s request for review. AR1-3. This appeal followed.

**B.      Relevant Medical Evidence**

      **1.      Pre-Decision Treatment Records**

            **a.      Treatment Records Regarding Physical Condition**

In July 2016, Mr. G. visited the emergency room (ER) at University of South Dakota's Sanford Medical Center (SMC) for a hand injury sustained during a dirt bike accident.  AR582.  He complained of pain with movement of his left third digit.  Id.  Although he admitted to hitting his head, he was wearing a helmet and never lost consciousness.  Id.  He denied nausea or vomiting.  Id.  Upon examination, the ER physician noted moderate edema to the left third digit, but his other examination findings were unremarkable.  AR583.  An x-ray of Mr. G.'s left hand was normal.  Id.  The ER physician assessed Mr. G. with a left finger sprain and discharged him with instructions to take over the counter pain relievers as needed.  Id.

On September 11, 2016, Mr. G. arrived at SMC's ER by ambulance after another dirt bike accident.  AR503.  Mr. G. reported that his chest and abdomen hit the bike's handlebars and the bike rolled on top of him.  Id.  He was wearing a helmet and denied losing consciousness, but said that he felt pain in his back, anterolateral chest wall, left shoulder, and left elbow.  Id.  Upon examination, Mr. G. complained of tenderness with palpation of his mid-thoracic spine, pain with palpation of the left anterolateral chest wall, and pain with range of motion in his left arm.  AR505.  The ER physician also noted a bruise and abrasion on Mr. G.'s outer left thigh, abrasions to his face, and

superficial abrasions to the left and right chest.  Id.  Mr. G. was admitted for inpatient care.  AR519, 522.

Chest and shoulder x-rays showed a mildly displaced left mid-clavicle fracture.  AR505-06, 532-33.  Computerized tomography (CT) of Mr. G.'s chest and thoracic spine showed a small pneumothorax with pneumopericardium and fracture of the right posterior fourth rib.  AR508-09.  A thoracic spine CT revealed a non-displaced fracture of the T4 vertebral body, complex fracture of the T5 vertebra with extension to posterior elements and 5mm bony retropulsion and obliteration of the left neuroforamina, complex fracture of the T6 vertebra without extension to posterior elements and no significant retropulsion, and fractures of the left T5-T7 transverse processes.  AR510-11.  The same study showed an incidental finding of mild anterolisthesis of T5 upon T6.  AR511.  A lumbar spine CT revealed a non-displaced fracture of the sacral spinous process but was otherwise unremarkable.  AR511-12.  Other tests, including head, cervical spine, and abdominal CT's were unremarkable.  AR507-12, 524.

Brian Wellman, M.D., a neurosurgeon at CMS, consulted on Mr. G.'s case.  AR514.  Dr. Wellman noted that Mr. G. denied sensory changes and weakness except as limited by pain.  Id.  Dr. Wellman conducted an examination and observed that Mr. G.'s neurological findings were normal.  AR516.  Except for some weakness associated with pain in the right upper extremity and lower extremities, Mr. G.'s extremity findings were also normal.  Id.  Dr. Wellman assessed Mr. G. with T4, T5, and T6 fracture with

retropulsion, left clavicle fracture, and left rib fracture.  Id.  Dr. Wellman observed that Mr. G. would likely require T3-T8 posterior fusion surgery.  Id. He ordered a brace and instructed Mr. G. to remain on bedrest.  Id.

On September 14, 2016, Geoffrey Haft, M.D., a neurosurgeon, performed an open reduction of a T5 fracture and T6 burst fracture, posterior spinal fusion from T3 to T8 with morselized iliac crest autograft harvested through a second incision.  AR539-41.  There were no surgical complications, and Mr. G. was stable following the surgery.  AR541.  Mr. G.'s post-operative plan provided for ambulation and seating immediately after surgery.  Id.  His surgeon also instructed him to wear a thoracic lumbosacral orthopedic brace.  AR576.

On September 17, 2016, Jason Hurd, M.D., an orthopedic surgeon, consulted on Mr. G.'s left clavicle fracture.  AR565.  Upon examination, Dr. Hurd noted mild swelling and no ecchymosis (bruising) or atrophy.  Id. Mr. G. complained of shoulder pain with range of motion.  Id.  Dr. Hurd noted a deformity over Mr. G.'s clavicle but observed that Mr. G. retained full range of motion in his elbow, wrist, and hand.  Id.  Dr. Hurd recommended surgery.  Id.

On September 18, 2016, Mr. G. underwent an open reduction and internal fixation of his clavicle.  AR570-77.  Mr. G. was stable following surgery.  AR571.  Mr. G. was discharged from the hospital the same day with prescriptions for diazepam, hydrocodone-acetaminophen, ibuprofen, ondansetron, and oxycodone.  AR573-574.  His shoulder was immobilized in a sling.  AR577.  Dr. Hurd instructed Mr. G. to follow up in two weeks.  AR576.

On September 27, 2016, Mr. G. saw Stacy Visker, APRN-CNP, for a two-week surgical follow up after his T3-8 fusion surgery. AR477. Mr. G. reported a 40% improvement in his pain, though he continued to complain of muscle type pain around his scapula, shoulder blades, and posterior and middle back. Id. Upon examination, NP Visker noted that Mr. G.'s incisions were healing well, and his neurological and motor exams were normal. Id. She continued Mr. G.'s restrictions but noted that Mr. G. was doing well overall. Id.

On October 5, 2016, Mr. G. saw Caleb Blauwet, P.A., for a two-week follow up after his shoulder surgery, reporting that he was doing well. AR494. Mr. G. mentioned occasional pain with numbness that traveled into his biceps, but it did not go beyond his elbow. Id. He denied numbness, tingling, and loss of sensation. Id. Mr. G. reported that he was alternating his use of oxycodone and Norco, and also taking ibuprofen for pain. Id. Upon examination, PA Blauwet observed some erythema (redness) at the incision site but noted that the incision was healing well. AR495. PA Blauwet noted some general tenderness and decreased sensation to light touch inferior to the incision. Id. Range of motion in Mr. G.'s shoulder was 100 degrees forward flexion, 30 degrees external rotation, and internal rotation to his chest wall. Id. Mr. G. exhibited full range of motion in his elbow, wrist and hand, normal sensation in his left arm, normal pulse, and normal strength. PA Blauwet noted that Mr. G.'s cervical spine, contralateral shoulder, and bilateral elbows were within normal limits. Id. PA Blauwet examined Mr. G.'s thoracic incision and noted some mild opening. Id. PA Blauwet removed Mr. G.'s sutures, instructed him

to continue wearing his shoulder sling, and told him to perform Codman and pendulum exercises at home. Id. PA Blauwet also told Mr. G. not to perform active range of motion or strengthening exercises, and to refrain from lifting, pushing, or pulling. Id. After conferring with Dr. Wellman's office, PA Blauwet prescribed Keflex for Mr. G.'s thoracic spine incision. Id.

On October 25, 2016, Mr. G. saw Dr. Wellman for a six-week post-surgical follow up after his thoracic fusion surgery. AR483. Mr. G. reported that he was doing well, with some "aches" but no significant pain. Id. In fact, he characterized his pain as 0 on a scale of 0-10. AR488. He denied neurological deficits. AR483. Upon examination, Dr. Wellman noted a small opening of the skin in the middle of Mr. G.'s incision, but no drainage or redness. Id. Dr. Wellman told Mr. G. to continue wearing his brace and to stay within his restrictions. Id. Dr. Wellman referred Mr. G. to physical therapy (PT). Id.

On October 28, 2016, Mr. G. saw Michelle Albrecht, PT, at Prairie Rehabilitation for an initial evaluation. AR750-52. Mr. G. complained of periodic pain and pain with flexion of his thoracic spine. AR750. He characterized his pain as 3 out of 10 at best and 8 out of 10 at worst. Id. Mr. G. reported difficulty with getting dressed, sleeping, bending forward, twisting motions, getting into his truck, and increased pain with a 1.5-mile walk. Id. PT Albrecht noted that Mr. G. wore a back brace "24/7 for 6-12 months to increase his posture and help with pain." Id. Mr. G. reported that his medications were Celexa, Depakote, ibuprofen, and Norco. Id.

Mr. G. displayed normal range of motion and strength in his right shoulder; Mr. G. deferred testing of his left shoulder due to pain. AR750-51. PA Albrecht noted that Mr. G. complained of tenderness with palpation to his back extensors and left and right rhomboid muscles. AR751. With regard to Mr. G.'s cervical and thoracic spine, she noted a forward head and rounded shoulders. Id. Mr. G.'s short term therapy goals were consistency with a home exercise program and in-office sessions and improved posture. Id. Long term goals included a reduction in pain to 2 out of 10 with activity, proper posture without verbal cues, and a 75-100% reduction in pain level. Id. PT Albrecht noted that Mr. G.'s rehabilitation potential was good. Id.

On October 31, 2016, Mr. G. attended PT. AR748. Mr. G. described his pain as 4/10 at its worst and stated that rest relieved his pain. Id. He further reported that it was painful to walk his dog because the dog pulled at the leash. Id. Mr. G. responded satisfactorily to treatment. AR749.

On November 1, 2016, Mr. G. saw Dr. Hurd for a six week post-surgical follow up on his clavicle. AR492. Though Mr. G. reported some numbness around his incision site, he stated that he was doing "really good" and denied any pain. Id. Mr. G. reported that things were also progressing well with his back. Id. Upon examination, Mr. G.'s active range of motion in his shoulder was 170 degrees forward flexion, 65 degrees external rotation, and internal rotation to L4, which Dr. Hurd characterized as "excellent." AR493. Range of motion in his elbow was normal. Id. Dr. Hurd noted that Mr. G.'s muscle strength was normal. Id. Dr. Hurd noted that, though Mr. G. had some

numbness inferior to his incision site, sensation was intact in the upper extremities and he displayed full muscle strength. <u>Id.</u> While Dr. Hurd discouraged lifting more than 15-20 pounds for the next few months (which he noted was unlikely due to Mr. G.'s back), he released Mr. G. to advanced activities as tolerated. <u>Id.</u>

On November 2, 4, 7, and 9, 2016, Mr. G. attended PT. AR740-47. At the November 2 session, Mr. G. again rated his worst pain as 4/10, and stated that rest improved his symptoms. AR746. Mr. G. reported that he was sleeping better, but that he had not been taking walks recently. <u>Id.</u> He complained of "slight" tightness in his shoulder after doing his home exercises. <u>Id.</u> PT Albrecht noted that Mr. G. attempted "bands," but that he found it too painful. <u>Id.</u>

At the November 4 session, Mr. G. rated his worst pain at 3/10, and stated that he had less pain in his back but more muscle soreness from exercises. AR744. PT Albrecht noted an increase in muscle tension in his upper trapezius muscle and a decrease in tension in his paraspinal muscles. <u>Id.</u> PT Albrecht observed that Mr. G. continued to present with forward shoulders and tight pectorals. <u>Id.</u>

On November 7, Mr. G. reported that his highest level of pain was 2/10. AR742. He stated that he was "feeling better and [wa]s having less pain" and said that he had "gone for multiple walks with his dog without pain." <u>Id.</u> PT Albrecht noted that Mr. G. was "getting better muscle contraction in back muscles." <u>Id.</u>

At the November 9 therapy session, Mr. G. stated that his worst pain level was 3/10. AR740. He complained of soreness from exercises and slight difficulty with sleep. Id. PT Albrecht noted that Mr. G.'s back strength was increasing and that his neck range of motion was improving. Id.

On November 11, 14, 16, and 18, 2016, Mr. G. attended PT. AR731-39. At the November 11 session, Mr. G. rated his worst pain as 3/10. AR738. Mr. G. reported scapular pain with exercises but said that it might have been due to his sleeping position. Id. PT Albrecht noted that Mr. G. presented with a posteriorly rotated left seventh rib. Id. She performed soft tissue massage with gentle pressure to help reset the rib. AR739. PT Albrecht instructed Mr. G. to reduce his home exercise program over the weekend if his shoulder pain continued, and she educated him on proper sleeping position. Id.

At the November 14 session, Mr. G. rated his worst pain at 4/10, and mentioned no new complaints. AR736. In fact, Mr. G. stated that he had a "mostly pain-free weekend," except for when he lay on his left side to sleep. Id. PT Albrecht noted that, although Mr. G.'s seventh rib was still slightly rotated, it was better than at the previous session. AR737. Mr. G. said that it was sore, but he denied any new pain. Id. PT Albrecht demonstrated the proper form for squats after Mr. G. asked to add them to his exercise program. Id.

On November 16, Mr. G. reported that his highest level of pain was 6/10 and his lowest was 2/10. AR734. He said that he thought his right shoulder blade pain was muscle soreness and represented that his worst pain was in the morning and that it gradually improved throughout the day. Id. Mr. G. also

complained of rib pain.  Id.  PT Albrecht attempted to reset the rib.  AR735.

Mr. G. asked to progress to more functional exercises at future sessions.  Id.

At the November 18 therapy session, Mr. G. stated that his worst pain

level was 4/10.  AR731.  He reported that his pain was in his left rib, and he

said that his back pain and surgical pain were minimal.  Id.  Mr. G. complained

of soreness from exercises and slight difficulty with sleep.  Id.  PT Albrecht

noted that Mr. G. had increased his strength and range of motion but needed

more improvement in order to return to his prior level of function.  AR732.

On December 12, 2016, Mr. G. attended therapy, reporting that his worst

pain was 5/10.  AR3286.  However, he also stated that his pain had been "very

minimal" and was decreasing.  Id.  Mr. G. represented that he only had left rib

pain while bending or twisting.  Id.  He also said that his shoulder no longer

inhibited his activities of daily living or caused him any pain.  Id.  He admitted

to not complying with his home exercise program while on vacation from

December 3-10.  Id.  PT Albrecht noted that Mr. G. presented with noticeable

fatigue and pressure tenderness in his L5-7 vertebrae.  AR3287.  PT Albrecht

noted that Mr. G. met his short-term goals (consistent performance of home

exercises/in-person therapy, improved posture, and a 25-50% reduction in

pain level).  Id.  She also noted that Mr. G. reached 90% of two goals (proper

posture without verbal cues, and a 75-100% reduction in pain level), and 75%

of his goal to have near-normal activities of daily living.  Id.

On December 13, 2016, Mr. G. saw Barry Schramm, PA, for a twelve-

week post-surgical follow up on his clavicle, reporting that he was "doing good"

and denying any pain. AR766. Upon examination, PA Schramm noted a well healed incision and full sensation in the left upper extremity. Id. Mr. G.'s shoulder range of motion was 170 degrees forward elevation, 70 degrees external rotation, and internal rotation to L1. Id. PA Schramm observed that range of motion in Mr. G.'s elbow, wrist, and hand was normal. Id. An updated shoulder x-ray was unremarkable. AR3032. PA Schramm suggested that Mr. G. maintain lifting limitations for four more weeks, but otherwise released Mr. G. to continue with activity as tolerated. AR766.

On December 22, 2016, Mr. G. saw Adam Walker, APRN-CNP, for another post-surgical follow up of his thoracic spine. AR757. Mr. G. reported on his attendance at physical therapy and stated that he was following restrictions with his brace. Id. He complained of some pain around the left fourth or fifth rib, but stated that he was doing well overall. Id. Mr. G. said that he no longer used any pain medication. Id. An updated x-ray showed good hardware placement and was otherwise unremarkable. AR757, 3040-41. NP Walker observed that Mr. G. could see an orthopedist if he continued to experience problems with his rib, but expressed the opinion that Mr. G.'s rib tenderness was likely due to the articulation along the T4 vertebrae that suffered fracture. Id. NP Walker approved Mr. G.'s advancement to water therapy and approved him to slowly lift other restrictions—including the use of his brace in the next month. AR757. NP Walker cautioned Mr. G. against resuming competitive fighting but said that Mr. G. could practice form and teach martial arts. Id.

On February 7, 2017, PT Albrecht discharged Mr. G. from therapy. AR3290. She noted that Mr. G. last attended therapy on January 11, 2017,[4] and that he continued to improve at that time, last rating his pain as 2/10. Id. PT Albrecht stated that Mr. G. cancelled subsequent appointments due to insurance issues and did not call to reschedule. Id. By the time of discharge, Mr. G. had either met his goals or achieved 90 percent of them. AR3291.

On February 28, 2017, Mr. G. contacted his neurosurgeon's office, reporting the denial of his disability application. AR3097. He stated that he would like to begin looking for work and needed to know if he had any physical restrictions. Id. NP Visker responded that, except for not returning to martial arts fighting competition, Mr. G. had no restrictions. Id.

In June 2017, Mr. G. called his neurosurgeon's office, requesting x-rays due to pain in his mid-back. AR3114. He stated that he thought his pain might be due to his sleep position or water therapy. Id. Updated thoracic x-rays were unremarkable. AR3122-23. A few days later, Mr. G. called back, asking what his "weight" restriction was. AR790. Office staff informed Mr. G. that he was "no longer on any surgical restrictions from this office." AR3117. Mr. G. requested a letter to that effect for his employer. Id. The evidence of record also includes a letter dated June 12, 2017, stating: "[Mr. G.] is no longer under any surgical restrictions. Any concerns [p]lease call our office." AR790.

In October 2017, Mr. G. contacted his neurosurgeon's office again. AR3194. Mr. G. reported that he injured himself at work while throwing

---

[4] The record does not include the treatment notes for this session.

garbage in a dumpster, and said that the worker's compensation physician wanted to send him to PT.  Id.  Mr. G. requested Dr. Wellman's approval before beginning therapy.  Id.  Office staff responded to Mr. G. to let him know that he could participate in PT, but that he should let the therapist know about his previous injuries.  Id.

### b.    Medical Evidence Regarding Mental Condition

In November 2015, Mr. G. saw Nicole Foos, CNP, for anxiety and medication management, reporting that he felt more irritable and anxious daily, but that Ritalin helped with his panic attacks.  AR619.  Mr. G. stated that he felt unmotivated to go to the gym, and he stopped the medication.  Id.  Mr. G. explained that he is more active since stopping Ritalin, but anxiety was still a concern for him.  Id.  NP Foos conducted a status exam; other than a notation of anxious mood, it was entirely normal.  AR620-21.  NP Foos assessed Mr. G. with anxiety and attention deficit hyperactivity disorder (ADHD).  AR621.  She discontinued Ritalin, prescribed Lexapro, and encouraged Mr. G. to try deep breathing and physical activities to control his anxiety.  AR619, 621.

In December 2015, Mr. G. followed up with NP Foos, complaining that Lexapro did not control his symptoms; he denied any side effects.  AR617.  However, Mr. G. explained that he just started Lexapro the week before after he experienced a panic attack during a work meeting.  Id.  Mr. G.'s mental status was completely normal.  AR618-19.  Nurse Foos told Mr. G. to keep taking Lexapro and to increase the dosage.  AR617, 619.  Nurse Foos offered Mr. G. a

prescription for Trazodone to help with sleep concerns, but he refused.  Id.
Nurse Foos also encouraged Mr. G. to start therapy.  AR617.

In January 2016, Mr. G. saw Vanessa Ferguson, Ph.D., for symptoms of
anxiety and possible ADHD.  AR614.  Mr. G. reported that he was taking
Lexapro and that he thought it helped with his symptoms.  AR615.  Except for
sleep problems and a report of some paranoid thoughts, Mr. G.'s mental status
exam was normal.  AR615-16.  Mr. G. completed screening questionnaires, in
particular the GAD-7 testing, and the results indicated mild depression and
mild anxiety.  AR616.  Dr. Ferguson assessed Mr. G. with unspecified anxiety
disorder, panic attacks, unspecified mood disorder, and rule out social anxiety,
ADHD, and personality disorder.  Id.

On May 10, 2016, Mr. G. followed up with NP Foos for medication
management, complaining that Lexapro did not control his anxiety symptoms;
he denied any side effects.  AR612.  However, the treatment note also indicates
that Mr. G. stopped taking his Lexapro and restarted it just four days prior to
the office visit.  AR612, 614. His mental status exam was normal.  AR613-14.
NP Foos noted that Mr. G. was able to function when his anxiety was managed.
AR614.  She referred Mr. G. to Dr. Ferguson for testing and counseling.
AR612.

The following day, NP Foos prescribed Trazodone to help with sleep
issues.  AR611.  Approximately a week later, Mr. G.'s mother called to report
that the Trazodone caused nightmares, he stopped taking his Lexapro due to
"h flashes," and that he was taking Ritalin, which had been discontinued.  Id.

16

On May 18, 2016, Mr. G. saw NP Foos for medication management, reporting that Lexapro started to cause "burning" throughout his body. AR608.  NP Foos noted that Mr. G. had been stable on Lexapro "until he abruptly stopped last month." Id.  Mr. G. also reported racing thoughts and a journal showed repeated entries about religion and politics. Id.  Mr. G. admitted to using alcohol, marijuana, and caffeine, but stated that he stopped after he began having symptoms a few weeks before the visit.  AR609.  NP Foos noted that Mr. G. made limited eye contact, appeared anxious and depressed, and admitted to paranoid and religious delusions; however, the remainder of his mental status exam was normal.  AR609-10.  NP Foos discussed medication compliance with Mr. G., after which she discontinued Lexapro and trazodone, and prescribed Abilify and Klonopin.  AR608, 610.  NP Foos referred Mr. G. to a "partial program," but he stated that he did not feel comfortable in group activities and preferred one on one counseling.  AR611.

Also on May 18, 2016, Dr. Ferguson administered psychological testing to Mr. G.  AR607-08.  Mr. G. completed a written version of the Minnesota Multiphasic Personality Inventory (MMPI-2), and it took him three hours to finish testing.  AR608.  On May 25, 2016, Mr. G. returned to Dr. Ferguson's office, and completed the Millon Clinical Multiaxial Inventory (MCMI-III). AR606.

On May 25, 2016, Mr. G. saw NP Foos for medication management. AR604.  Mr. G. denied any side effects from Abilify and Klonopin and asked to increase his dose of Abilify because he did not see much difference in his mood.

Id. NP Foos explained that it took about fourteen days to see the effects of Abilify. Id. Mr. G. reported that Klonopin helped with his anxiety and improved his sleep. Id. Mr. G.'s mental status exam was normal. AR605-06. NP Foos increased Mr. G.'s dosage of Abilify, and encouraged him to continue exercising, biking with friends, and working. AR606. She observed that Mr. G. did well when he stayed busy. Id.

In June 2016, Dr. Ferguson noted that Mr. G. did not show up to discuss his testing results. AR607. Dr. Ferguson reported that Mr. G.'s testing was not wholly reliable because he did not complete both tests on the same day and did not participate in an interview with Dr. Ferguson at the time of testing. Id. Dr. Ferguson also noted "significant" differences in diagnostic outcomes on the MMPI-2 (taken prior to starting Abilify) and the MCMI-III (taken a week later). Id. The results of the MMPI-2 suggested possible paranoid schizophrenia or a delusional disorder, whereas the MCMI-III suggested depression, generalized anxiety disorder, bipolar disorder, avoidance personality disorder, and dependent personality disorder with borderline personality and self-defeating personality features. Id.

In June 2016, Mr. G. saw NP Foos for medication management, reporting that he felt that Abilify increased his anxiety and paranoia. AR600. NP Foos conducted a mental status exam which showed that, except for an anxious mood and paranoia, Mr. G.'s mental status was normal. AR602. While in the session, it was noted that Mr. G. endorsed excessive worrying, feelings of hopelessness and or guilt, anhedonia, hallucination/delusional thought, and

18

suicidal ideations.  Id.  NP Foos decreased Mr. G.'s Abilify, and prescribed Ativan, Celexa, and Risperdal.  A601, 603.

Mr. G. also saw Sarah Konrady, Ph.D., in June 2016 for his symptoms of anxiety and depression.  AR598-99.  Dr. Konrady conducted a mental status exam and observed that Mr. G. made infrequent eye contact and spoke loudly and rapidly, but in an appropriate rhythm.  AR600.  Mr. G.'s mood was euthymic, and his affect was "mostly" positive.  Id.  Dr. Konrady noted no psychotic behavior and no concern of suicidal ideation.  Id.  Dr. Konrady assessed Mr. G. with general anxiety disorder, major depressive disorder, recurrent episode, mild, psychosis delusional disorder, and ruled out schizophrenia.  Id.

Mr. G. saw NP Foos for medication management twice in July 2016.  At the first visit, Mr. G. denied any side effects from medication.  AR593.  NP Foos noted that it would be a few more weeks before Celexa helped with Mr. G.'s anxiety.  Id.  Mr. G. reported that he was taking Ativan three times a day and said that he napped for three hours in the afternoons.  Id.  NP Foos recommended decreasing his use of Ativan.  Id.  Mr. G. stated that he was sleeping well with Risperdal, and NP Foos suggested discontinuing Klonopin. Id.  Except for paranoid delusions, Mr. G.'s mental status was normal. AR584-85.  He endorsed fatigue, excessive worrying, and hallucination/delusional thoughts.  Id.  At the second visit, Mr. G. complained of grogginess with Risperdal.  AR585.  NP Foos noted that Mr. G. did not appear anxious, as he took an Ativan prior to the appointment.  Id.  NP Foos

observed: "[Mr. G.] is fairly stable, doing well at work, and sleeping every night." Id. Except for variable mood, Mr. G.'s mental status was normal. AR585-87. He endorsed sleep concerns, fatigue, excessive worrying, feelings of hopelessness and/or guilt, lack of focus/concentration, irritability/agitation and hallucination/delusional thought. Id. NP Foos discontinued Risperdal and prescribed Depakote. AR585, 587.

Mr. G. saw Dr. Ferguson twice in July 2016. AR587-91. At the first office visit, Dr. Ferguson administered the Personality Assessment Inventory (PAI) due to complications during Mr. G.'s earlier testing. AR590. The results of the PAI suggested unspecified adjustment disorder, and rule outs for dysthymic disorder, bipolar I disorder, substance dependence, and personality disorder not otherwise specified. AR590-91. Dr. Ferguson noted that the

> PAI profile is suggestive of someone who is having significant thinking and concentration problems, accompanied by prominent agitation and distress. He is likely to be withdrawn and isolated, have few if any close interpersonal relationships and may get quite anxious and threatened by such relationships at times. His social judgement [sic] is fairly poor and he has difficulty making decisions, even about matters of little importance. He does experience unusual sensory events that at times include hallucinations (hearing voices that he states are muffled, seeing a dark silhouette that he indicated others had seen and that was suspected to be a ghost, and block dots), as well as unusual ideas that may include magical thinking or delusions (paranoia that others are out to get him—part of this his mother noted comes from his father's pontification about religious themes and being at risk for being attacked by terrorists and others for having Christian beliefs). Thought processes are likely to be marked by confusion, distractibility and difficulty concentrating and he may experience his thoughts as blocked, withdrawn or somehow influenced by others. Again, he is likely to have some difficulty establishing close interpersonal relationships. Luke is experiencing a discomforting

level of anxiety and tension. He can be plagued by worry to a
degree that his ability to concentrate and attend are significantly
compromised.

AR1004. Dr. Ferguson explained that due to the medications Mr. G. was

taking, some of his symptoms might be masked and that there was also a

possibility of schizophrenia or a delusional disorder. AR591.

The second visit was a therapy session, during which Dr. Ferguson

observed that Mr. G. sometimes seemed to be distracted by something

internally but was easily redirected. AR587. His mental status exam was

otherwise unremarkable. AR587-88. Dr. Ferguson counseled Mr. G. to avoid

stimulants and recreational drugs and encouraged him to set healthy

boundaries with others. AR589.[5]

In August 2016, Mr. G. followed up with NP Foos for medication

management, and denied any medication side effects. AR580. His mental

status was normal. AR581-82. NP Foos noted that Mr. G.'s symptoms were

well-controlled on his current medications and that he was stable overall.

AR580.

Mr. G. also saw Dr. Ferguson in August 2016. AR578. Except for a

report of some auditory hallucinations, Mr. G.'s mental status was normal. Id.

Dr. Ferguson reminded Mr. G. of the negative impact of stimulants and

suggested that he exercise or have a snack as alternatives. Id. She also

---

[5] Although the parties do not mention it, it appears Dr. Ferguson diagnosed
Mr. G. with bipolar I, unspecified anxiety disorder, and personality disorder
NOS with mixed avoidant, paranoid and schizotypal features as early as this
July 14, 2016, visit. AR589.

encouraged Mr. G. to set good boundaries in his relationships.  Id.  Her diagnosis at the end of the session on August 15, 2016, was: bipolar I disorder, most recent episode manic, unspecified anxiety disorder, unspecified personality disorder NOS with mixed avoidant, paranoid and schizotypal features.  AR578.

During a September 2016 hospitalization for a dirt bike accident, Mr. G. tested positive for marijuana.  AR538.  He denied marijuana use, but later admitted that he "smoked a 'brownie' " a few weeks ago.  AR538, 556.  His mental status was normal.  AR538.

In November 2016, Mr. G. saw Dr. Ferguson for a therapy session.  AR770.  Mr. G. discussed his job loss, his dirt bike accident, frustration with his father, and his continued belief that others were able to read his mind.  Id.  Mr. G. stated that he received unemployment after he lost his job, but the benefits ended after his dirt bike accident.  Id.  He also discussed concerns about his medication, complaining that he felt "numb" and found it hard to focus.  Id.  Dr. Ferguson encouraged Mr. G. to speak with NP Foos about his concerns.  Id.  She reminded Mr. G. to abstain from stimulants and recreational drugs, and to set good boundaries.  AR771.  Dr. Ferguson told Mr. G. to return in two weeks, but he did not do so.  AR764, 771.

In December 2016, Mr. G. followed up with APRN-CNP Johnson[6] for medication management and denied side effects.  AR767.  Mr. G. also reported that he was tapering off Depakote.  Id.  APRN-CNP Johnson counseled Mr. G.

[6] NP Foos underwent a name change.

on medication compliance and warned him that sudden withdrawal of a mood stabilizer could cause a manic episode. <u>Id.</u> APRN-CNP Johnson noted that she saw no sign of sedation with Depakote and Mr. G.'s reports of no psychosis were positive signs that the medication had improved his symptoms. AR769. APRN-CNP Johnson also discussed Mr. G.'s positive drug screen while hospitalized, and he expressed anger about the mental health assessment and implications concerning his use of marijuana. AR767. Other than appearing depressed, Mr. G.'s mental status was unremarkable. AR768-69. APRN-CNP Johnson prescribed Valium and continued Mr. G.'s other medications. AR769.

In December 2016, Mr. G. saw Dr. Ferguson for another therapy session. AR764. Dr. Ferguson noted times when Mr. G. appeared distracted, but he "snap[ped] back" when she spoke to him. <u>Id.</u> Mr. G. described his mood as "numb;" however, his mental status was otherwise normal. <u>Id.</u> Dr. Ferguson led Mr. G. through relaxation exercises and told him to return in two weeks. <u>Id.</u> However, he did not do so.

In January 2017, Mr. G. saw APRN-CNP Johnson for medication management. AR761. Mr. G. reported that Depakote made him feel tired. <u>Id.</u> A mental status exam revealed religious delusions but was otherwise normal. AR762-63. APRN-CNP Johnson encouraged Mr. G. to walk his dog if someone else walked the dog due to his injuries and to go out with friends. AR763. APRN-CNP Johnson noted that Mr. G.'s symptoms were well-controlled on his current medications, especially sleep and daytime anxiety. AR761, 763. She decreased his dosage of Depakote and increased Celexa. AR763.

In February 2017, Mr. G. followed up with APRN-CNP Johnson, denying medication side effects. AR780. Mr. G. reported that he felt less fatigued and his memory was better on the lower dose of Depakote, and he denied mood concern or increased paranoia. Id. Mr. G. stated that he was participating in water therapy and trying to stay active. Id. Mr. G.'s mental status was normal. AR782-83. APRN-CNP Johnson noted again that Mr. G.'s symptoms were well-controlled on his current drug regimen. AR780.

In April 2017, Mr. G. saw APRN-CNP Johnson for medication management. AR785. Mr. G. reported some anxiety related to financial stressors but denied paranoia. Id. He stated that he was working at Midco doing light janitorial work. Id. Mr. G. also mentioned that he appealed his disability denial. Id. His mental status was normal. AR787-88. APRN-CNP Johnson noted that Mr. G.'s symptoms were well-controlled. AR785.

In July 2017, Mr. G. saw APRN-CNP Johnson. AR3135. APRN-CNP Johnson noted that she filed a prescription for Ativan the prior week due to panic attacks, and Mr. G. stated that he was not sure what caused the attacks, except that work was busier. Id. He stated that the job at Midco was a good fit for him, but that he did not earn enough to pay his bills. Id. Mr. G. mentioned his disability denial and his plan to appeal the decision. AR3135-36. His mental status was normal. AR3137-39. APRN-CNP Johnson noted that Mr. G.'s symptoms were well-controlled on his current medications. AR3135-36.

In August 2017, Mr. G. saw APRN-CNP Johnson for medication management, reporting increased anxiety. AR3153. Mr. G. mentioned that he missed his medication a few days a week, and APRN-CNP Johnson explained that his increased anxiety was likely due to his lack of compliance. Id. Mr. G.'s mental status exam was normal. AR3155-56. APRN-CNP Johnson increased Mr. G.'s Valium dosage temporarily, advised him to use Ativan as needed, and told him to resume taking Celexa and Depakote on a regular schedule. AR3153-54, 3157.

In September 2017, Mr. G. called APRN-CNP Johnson's office, reporting that he had felt manic all week and said he had not slept in several days. AR3169. APRN-CNP Johnson instructed him to temporarily increase his Depakote dosage, prescribed Risperdal, and told him to go to Avera for assessment if he "truly does feel he is manic." Id. A few days later, Mr. G. saw APRN-CNP Johnson for an office visit, reporting that he had decreased his Depakote. AR3175. APRN-CNP Johnson noted the recent medication changes she made and observed that Mr. G. did not appear fatigued or sedated, as he had reported during a past trial of the same combination of medication (Depakote and Risperdal). Id. Mr. G. denied paranoia in the past few days and stated that he was no longer fixating on the Bible or social media, his anxiety was under control, and he did not feel depressed or detached from reality. AR3175-76. Mr. G.'s mental status was normal. AR3177-79. APRN-CNP Johnson told him to continue taking his medication. AR3179.

In October 2017, APRN-CNP Johnson wrote a letter that stated she provided medication management for Mr. G.'s bipolar disorder. AR791. In October 2017, Mr. G. also saw APRN-CNP Johnson for medication management, denying medication side effects. AR3217. Mr. G. reported losing his job. Id. She further observed that Mr. G. was "frantic that he needs more from provider for lawyer to ensure that he wins case." AR3217. Except for irritability, Mr. G.'s mental status was normal. AR3219-21. APRN-CNP Johnson increased Mr. G.'s dosage of Risperdal, decreased Ativan, and told him to stop his excessive caffeine intake because it was the likely cause of his insomnia. AR3218, 3221. APRN-CNP Johnson suggested that Mr. G. "look for work as [he] can not [sic] rely on disability." AR3221.

In November 2017, Mr. G. saw APRN-CNP Johnson, and denied medication side effects. AR3232. APRN-CNP Johnson noted that Mr. G. recently canceled a counseling session with Kelli Willis, and she told him that she recommended he see someone since medication could "only . . . do so much for managing mood." Id. Mr. G.'s mental status was normal. AR3234-35. APRN-CNP Johnson noted that Mr. G. "continues to report anxiety attacks twice a day with random thoughts or feeling a negative energy." AR3232. APRN-CNP Johnson noted that Mr. G.'s symptoms were well-controlled on his current medications; however, she increased Mr. G.'s Valium, decreased Ativan, and Risperdal, and encouraged him to exercise. AR3232-33, 3236.

In February 2018, Mr. G. saw Barbara Wendell-Schechter, NP, for medication management, reporting weight gain as a side effect of his medication. AR3262. He reported mood issues associated with the stress of selling his home and moving to an apartment. Id. Mr. G. asked that a companion form be completed so that his dog could move to the apartment with him. Id. His mental status was normal. AR3264-65. NP Wendell-Schechter encouraged Mr. G. to exercise and eat healthy meals to manage his weight. AR3263.

### 2. Post-Decision Treatment Records

In January 2019, Mr. G. called with a refill request for Ativan. AR79. APRN-CNP Johnson reported that she did not want to continue Ativan long term because Mr. G. was taking Valium twice a day. Id. She discontinued Ativan. Id.

In February 2019, Mr. G. saw APRN-CNP Johnson. AR81. APRN-CNP Johnson noted that she last saw Mr. G. in November 2018. Id. Mr. G. mentioned that he had been denied disability twice and was having difficulty making friends in Brandon. Id. APRN-CNP Johnson noted that Mr. G. was not getting socialization outside of social media. Id. Mr. G. stated that he still had some intrusive thoughts about religion or mild paranoia about what others thought of him. Id. Mr. G. reported that he was quitting his martial arts job and starting work as a busboy at a local steak house a few days a week. Id. Mr. G. said that he was excited about the change but expressed some nervousness about adjusting to the change. Id. He also reported a panic

attack when his truck was repossessed the prior week. Id. Mr. G. reported ongoing pain from his motorcycle accident. Id. Except for reported religious delusions and intrusive thoughts while watching television programs with political or religious content, Mr. G.'s mental status was normal. AR83-85. APRN-CNP Johnson noted that Mr. G.'s symptoms were well-controlled on his current medications. AR81. However, recent lab work showed an increase in liver enzymes, possibly due to Depakote. AR81, 85. Mr. G. asked to discontinue Depakote. AR81. APRN-CNP Johnson agreed since Mr. G. was not depressed, showed no mania symptoms, and his anxiety was mild. Id. Mr. G. rejected APRN-CNP Johnson's suggestion to increase Risperdal. Id.

Mr. G. called APRN-CNP Johnson the following week to inquire about taking diazepam three times a day instead of two. AR98. He reported agitation that caused an increase in anxiety, but it was not tied to a specific event. Id. Mr. G. said that he was not seeing a therapist and did not want to see one. Id. He reported that he was sleeping "alright." Id. APRN-CNP Johnson refused Mr. G.'s request to increase diazepam and recommended an increase in Risperdal, which Mr. G. refused. Id.

In March 2019, Mr. G. sought treatment at SMC's ER after a motor vehicle accident. AR102, 104. He complained of pain in his left shoulder and numbness in the second, third, and fourth digits of his left hand. Id. Mr. G. also reported that he had chronic back pain from a prior injury, but that it was worse after the recent accident. AR104. He also complained of pain and stiffness in his neck. AR106. Upon examination, Mr. G. reported tenderness

with palpation of his left shoulder and clavicle but denied tenderness to palpation along his spinous processes and paraspinal muscles. AR107. Mr. G. exhibited equal grip strength and equal push/pulls of the upper extremities. Id. He was able to lift each leg off the bed, plantarflex and dorsiflex both feet bilaterally against resistance. Id. Though Mr. G. said it "felt different" when touching the second, third, and fourth digits of his left hand, he appeared to retain intact sensation. Id. X-rays of Mr. G.'s left shoulder and cervical and thoracic spine were unremarkable. AR107-18, 119-21. The ER physician discharged Mr. G. with instructions to take Tylenol and ibuprofen, and to rest, elevate, and ice his left upper extremity. AR103, 108.

In March 2019, Mr. G. saw APRN-CNP Johnson. AR153. Mr. G. stated that his mood had been stable until he ran out of Valium, following which he did not sleep, and experienced sweating, cramps, and felt "sick." Id. However, Mr. G. stated that his mood was managed after he refilled his medication the next day. Id. Mr. G. denied any sleep issues and his only depressive concern was his third denial of disability. Id. He reported that he continued to work at the steak house three to four hours a day and said he might request more hours. Id. Mr. G. complained of increased pain after a recent car accident. Id. Mr. G.'s mental status was normal. AR155-57. APRN-CNP Johnson noted that Mr. G.'s symptoms were well-controlled on his current medications. AR153. APRN-CNP Johnson recommended that Mr. G. decrease his use of Valium and discontinue it within the next few months. AR153, 157.

### 3. Consultative Examinations

#### a. Dr. McGrath

On August 7, 2018, Mr. G. saw Michael McGrath, Ph.D., for a consultative psychological evaluation. AR3661-65. Dr. McGrath observed that Mr. G. arrived on time for the evaluation, and that he drove himself. AR3661. Dr. McGrath conducted a mental status exam, and observed that Mr. G. dressed casually, but neatly, was well-groomed, and he ambulated independently and maintained appropriate sitting posture. Id. Mr. G. maintained good eye contact, and was cooperative; his speech was normal, he comprehended auditory verbal input easily and was responsive to interview questions. Id. Dr. McGrath noted that Mr. G.'s thought processes were logical with no signs of psychosis. Id. Mr. G.'s mood was within normal limits and his affect was flexible and appropriate. Id.

During the interview, Mr. G. stated that he decided to apply for benefits partly due to his family's urging. AR3661. He also said that he did not feel like he could earn at least $12,000 annually because his "memory is off" and he had a physical injury that made lifting difficult. Id. Mr. G. stated that he was in special education throughout school and had individual education plans (IEPs). Id. He never repeated any grades. AR3662.

Mr. G. described a typical day as beginning around 8:30 in the morning, at which time he walked his dog. AR3661. After breakfast, he watched TV for about 7 hours. Id. In the evenings, Mr. G. "surfed the web" and played video games, unless he was teaching a Taekwondo class. AR3661-62. Mr. G.

30

sometimes helped do the dishes after the evening meal, before taking his dog for another walk. AR3662. He then showered, ate a snack, and watched television for a few more hours. Id.

Mr. G. stated that it usually took him about 20 minutes to fall asleep and said that he had trouble staying asleep a few times a week. AR3662. He reported having nightmares four times a week. Id. Mr. G. stated that he performed household chores a few times a week, including cleaning, vacuuming, mopping, doing the dishes, and taking out the trash. Id. Mr. G. reported that he was able to drive, and that he did not usually become lost or confused. Id. He stated that he was able to manage a checking account, but that he had "money spending issues" and sometimes did not pay attention to his account. Id. He stated that he was able to use a smartphone and do online shopping. Id. Mr. G. also reported that he swam for therapeutic purposes. Id. He represented that he usually did not go to the store alone because of panic attacks. Id.

Mr. G. stated that he had a few friends during his developmental years and denied bullying or being bullied. AR3662. He also admitted to associating with co-workers while living in Rapid City, South Dakota, for a few years. Id. Mr. G. stated that, since moving back to his hometown, he had not made many friends. Id. However, he stated that he has a few friends at Taekwondo class but does not see them outside of that setting. Id. Mr. G. also stated that, though he last dated in 2016, he had girlfriends in the past. Id.

Mr. G. stated that he had to use a back brace because of his back fracture, which results in some difficulty with bending and lifting. AR3663. He also stated that his back hurt if he sat for extended time periods. Id. Mr. G. also mentioned daily back and left clavicle pain, but Mr. G. stated that his back brace and Aleve helped with his pain. Id.

Mr. G. reported that he saw his therapist twice monthly, and a nurse practitioner for medication management every three months. AR3663. He listed his current medications as Depakote, Valium, Celexa, risperidone, and lorazepam, and stated that his mother helps him manage his medications. Id. Mr. G. described a history of depression and alleged bipolar disorder. Id. Mr. G. stated that brief episodes of daily depression affected his concentration and ability to "focus," and caused diminished motivation. Id. He mentioned anxiety, and related that his anxiety episodes lasted between five minutes to eight hours and occurred approximately four times a week. Id. Mr. G. said that his anxiety made him want to seclude himself and affected his motivation. Id. He noted that he felt that others could hear his thoughts and insert thoughts in his head but claimed only one episode of auditory hallucination. Id. Mr. G. mentioned approximately six episodes of purported mania since 2014. Id.

Mr. G. stated that he was discharged from employment on three occasions but maintained that he related adequately to supervisors and coworkers. AR3664.

32

Dr. McGrath administered a full-scale intelligence quotient (FSIQ) test, and Mr. G. scored a 75, which suggested significant and marginally clinically meaningful decline in overall intellect. AR3664, 3666-69. However, Dr. McGrath also noted that, given his atypical education, demographics might have overestimated Mr. G.'s prior intellectual functioning. Id. Dr. McGrath opined that, based on available validity measures, Mr. G.'s test results appeared valid. Id. Dr. McGrath also stated that Mr. G.'s memory function fell in the uppermost range of mild intellectual impairment at the 2nd percentile; however, he was uncertain of how valid the scoring was for the memory portion of Mr. G.'s testing. Id.

Dr. McGrath observed that Mr. G.'s fund of knowledge was in the upper borderline range, suggesting a history of marginal formal education. AR3664. Mr. G.'s verbal comprehension was in the mid-borderline range at the 7th percentile, and his vocabulary fell in the dull normal range with capacity to appreciate relationships among words in the mid-borderline range. Dr. McGrath opined that Mr. G. had a marginal capacity to express himself and to comprehend daily verbal input. Id.

Dr. McGrath reported that Mr. G.'s transient auditory attention was in the upper borderline range at the 9th percentile, and transient visual attention was in the dull normal range at the 16th percentile. AR3664. He noted that digit span fell in the low normal range "with a visual analog of this ability being somewhat better" and falling slightly above the midpoint of the normal range. Id. Mr. G.'s capacity for mental arithmetic was in the mid-borderline range,

possibly reflecting a lack of basic arithmetic skills and mild attentional ability. Id. Dr. McGrath opined that Mr. G.'s attention abilities were marginal to fair, and while Mr. G. might have some inefficiency in terms of daily functioning, it was not incapacitating. Id.

Dr. McGrath observed that Mr. G.'s auditory memory fell in the lower half of the range of mild intellectual impairment at the 0.3 percentile, and that visual memory was in the dull normal range at the 19th percentile. AR3665. However, Dr. McGrath also stated that despite the difference in scores, Mr. G.'s auditory and visual memory did not differ statistically. Id. Dr. McGrath reported that Mr. G.'s immediate and delayed memory fell at the uppermost point of the range of mild intellectual disability at the 2nd percentile. Id. He noted that both scores were worse than expected functioning. Id. Dr. McGrath opined that Mr. G.'s memory functioning was relatively poor on an immediate and delayed basis and was particularly impaired in terms of auditory memory, with visual memory being marginally adequate. Id. Dr. McGrath stated that he was unable to tell whether Mr. G.'s current memory functioning represented a change from premorbid functioning. Id.

Dr. McGrath stated that Mr. G.'s speed of processing visual input fell in the low borderline range at the 3rd percentile, and his capacity to organize visual input perceptually and to make sense of it was in the dull normal range at the 18th percentile. AR3665. Dr. McGrath further observed that Mr. G.'s visually mediated reasoning fell in the lower half of the normal range, and his

spatial reasoning capacity fell in the dull to low normal range, suggesting a fair capacity to appreciate spatial relationships and follow spatial directions.  Id.

Dr. McGrath listed his diagnostic impressions as low borderline intellectual functioning, mild persistent depressive disorder, and frequent headaches and chronic back and left clavicle pain.  AR3665.

Dr. McGrath concluded that, while Mr. G.'s IQ scores were significantly less than estimated premorbid functioning, it was unclear whether the premorbid estimates were valid estimates of functioning.  AR3665.  He further observed that the premorbid estimates may be overestimates, thus leading to the impression of a decline in intellectual functioning.  Id.  Finally, Dr. McGrath stated that Mr. G. was probably able to manage benefits payments on his own.  Id.

Dr. McGrath also completed a medical source statement regarding Mr. G.'s ability to do mental work-related activities.  AR3670-72.  Dr. McGrath opined that Mr. G.'s abilities to understand and remember simple instructions and to make judgments on simple work-related decisions was moderately impaired; his ability to carry out simple instructions was mildly impaired; his abilities to understand, remember, and carry out complex instructions were markedly impaired; and his ability to make judgments on complex work-related decisions was extremely impaired.  AR3670.  He listed low intellectual functioning at the 5th percentile and impaired memory as support for his opinion at the 2nd percentile.  Id.

Dr. McGrath further opined that Mr. G.'s abilities to interact appropriately with the public and to respond appropriately to usual workplace situations and to changes in a normal work setting were moderately impaired, and that his abilities to interact appropriately with supervisors and coworkers was mildly impaired. AR3671. Dr. McGrath listed Mr. G.'s IQ and memory functioning, as well as behavioral observations and social history as support for his opinion. Id.

Dr. McGrath stated that Mr. G.'s mental impairments also resulted in a poor capacity for concentration and difficulty with persistence and pace due to frequent restroom use. AR3671. He listed Mr. G.'s testing results and work history as support for his opinion. Id.

Dr. McGrath stated that Mr. G.'s IQ and memory impairments were lifelong, but that he could not opine regarding an onset date. AR3671. He also stated that alcohol and substance abuse did not contribute to Mr. G.'s mental limitations. Id.

Contrary to his statement in the written evaluation, Dr. McGrath opined that Mr. G. was unable to manage benefits payments. AR3672.

### b. Dr. Doorn

On August 8, 2020, Mr. G. saw Joshua Doorn, M.D., for a consultative physical examination. AR3648-50. Mr. G. reported that his alleged disability stemmed from his back and clavicle injuries and his mental impairments. AR3648. Mr. G. stated that he has had significant pain since his back injury. Id. He also represented that he wore his back brace for support while driving,

but otherwise did not wear it all the time.  Id.  Mr. G. also reported that walking, twisting, and "activities" aggravated his back pain, but that changing positions and moving from sitting to standing helped.  Id.  He complained of occasional tingling down his left arm and "sleepiness" in both arms at times.  Id.  Mr. G. stated that he took over the counter medications, and that they helped him some.  Id.

With regard to his mental impairments, Mr. G. stated that he had anxiety, depression, and schizoaffective disorder.  AR3648.  Mr. G. reported that he sometimes heard voices when he was manic, but stated that he had never been hospitalized, and he denied any past suicide attempts or current suicidal ideation.  AR3649.

Upon physical examination, Dr. Doorn observed that Mr. G. had limited flexion and extension in his back and shoulder.  AR3650.  Lateral flexion in Mr. G.'s back was 10 degrees, and he was unable to adduct his shoulder and could abduct it to shoulder height.  Id.  Dr. Doorn noted that Mr. G.'s shoulder strength was 4/5 on the left and 5/5 on the right, and he had full strength in both lower extremities.  Id.  Dr. Doorn also observed an abnormal empty can test in the left shoulder.  Id.  He noted that Mr. G. had normal strength in his feet and ankles.  Id.

Dr. Doorn noted that Mr. G. complained of pain with palpation of the spinous process throughout, with the thoracic spine being worse than the lumbar spine.  AR3650.  Mr. G. also complained of tenderness to palpation of the paraspinous muscles throughout his back.  Id.

Dr. Doorn observed that Mr. G. had trouble walking on his heels and toes and could not do a "duck walk," but his gait was normal.  AR3650. Dr. Doorn also noted that a Romberg test was normal, Mr. G.'s reflexes were normal, and his sensation was intact.  Id.

Dr. Doorn observed that Mr. G.'s mood and affect were normal.  AR3650.

Dr. Doorn also noted that Mr. G. alternated between sitting and standing throughout the exam.  AR3650.

Dr. Doorn assessed Mr. G. with history of dirt bike accident with limited range of motion of his back and history of psychiatric disorders .  AR3650.

Dr. Doorn completed a medical source statement of ability to do work-related physical activities.  AR3651-56.  Dr. Doorn did not evaluate Mr. G.'s abilities to lift and carry.  AR3651.  He opined that Mr. G. was able to sit and walk for one hour at a time and in an 8 hour workday, and stand for 8 hours at a time and in an 8 hour workday, and did not require the use of a cane to ambulate.  AR3652.  Dr. Doorn opined that Mr. G. was unable to reach overhead with his left hand, could occasionally perform other reaching, and push and pull with his left hand, frequently handle with his left hand, and continuously finger and feel with his left hand.  AR3653.  Regarding the use of the right upper extremity and bilateral feet, he opined that Mr. G. had no limitations.  Id.  Dr. Doorn opined that Mr. G. was able to occasionally climb ladders or scaffolds and continuously climb stairs and ramps; occasionally stoop, kneel, and crouch, but not crawl, and frequently balance.  AR3654.  He further opined that Mr. G. should not be exposed to unprotected heights and

could occasionally be exposed to moving mechanical parts but had no other environmental restrictions.  AR3655.  As support for his opinion, Dr. Doorn simply stated "see physical exam."  AR3653-55.

Dr. Doorn opined that Mr. G. was able to shop; travel without a companion, ambulate without using a wheelchair or assistive device; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a handrail; prepare a simple meal and feed himself; care for his personal hygiene, and sort, handle, or use paper and/or files.  AR3656.

## C.    Non-Examining State Agency Consultants' Opinions

### 1.    Dr. Whittle

In February 2017, Kevin Whittle, M.D., reviewed the medical evidence of record and provided a medical assessment of Mr. G.'s projected condition as of September 2017, twelve months following his alleged onset date.  AR238.

Dr. Whittle noted the October, November, and December 2016 post-surgical follow up notes from Mr. G.'s treating neurosurgeon and orthopedist.  AR238.  In particular, Dr. Whittle noted Mr. G.'s October 2016, report that he was doing well and was in no significant pain and had no neurological deficits.  Id.  Dr. Whittle noted the neurosurgeon's referral to physical therapy and his instructions that Mr. G. should continue wearing his brace.  Id.

Dr. Whittle also referenced the orthopedist's November 2016 records which stated that Mr. G. was doing "really good" and denied any pain.  AR238.  Dr. Whittle noted that the physical exam findings revealed normal gait,

shoulder active range of motion of 170 degrees forward elevation, 65 degrees external rotation, and internal rotation to L4; full range of motion in the left elbow; full muscle strength; and intact sensation. Id.

Dr. Whittle further cited to the orthopedist's December 2016 notes, which showed that Mr. G. said he was doing well. AR238. Dr. Whittle noted that the physical exam findings revealed normal gait, shoulder active range of motion of 170 degrees forward elevation, 70 degrees external rotation, and internal rotation to L1; and full range of motion in the left elbow, wrist, and hand. Id.

Dr. Whittle opined that Mr. G.'s conditions were projected to be non-severe by September 2017. AR238.

### 2. Dr. Barker

In May 2017, James Barker, M.D., reviewed the medical evidence of record and provided a medical assessment of Mr. G.'s projected condition as of September 2017, twelve months following his alleged onset date. AR247-48. Dr. Barker noted that there was no updated physical evidence after the initial claim. AR248. Dr. Barker affirmed Dr. Whittle's opinion that Mr. G.'s condition would be non-severe by September 2017. Id.

### 3. Dr. Deloy

In February 2017, Joel Deloy, Ph.D., reviewed the medical evidence of record and completed a Psychiatric Review Technique (PRT) form. AR239-40. Dr. Deloy opined that Mr. G. had a depressive and/or bipolar disorder and anxiety disorder. AR239. He opined that Mr. G.'s abilities to understand,

remember, and apply information, interact with others, and concentrate, persist, and maintain pace were mildly limited.  Id.  Regarding the ability to adapt or manage himself, Dr. Deloy opined that Mr. G. had no limitations.  Id.  He opined that Mr. G.'s mental impairments were non-severe.  AR239-40.

As support for his opinions, Dr. Deloy noted that Mr. G. represented on his function report that his attention span varied based on interest, and though he sometimes needed reminders, he was able to follow written instructions and verbal instructions.  AR240.  Dr. Deloy further noted Mr. G.'s report that he had no problems with personal care due to mental issues, and he was able to prepare simple meals, manage his finances, and shop.  Id.  Dr. Deloy also noted that Mr. G. does not handle stress or changes to routine well.  Id.

Dr. Deloy also looked to the medical records to support his opinion.  AR240.  He noted that Mr. G.'s medical provider felt that his bipolar disorder was in remission, as indicated by record notations that Mr. G.'s symptoms were well-controlled by his medications.  Id.  Dr. Deloy noted Mr. G.'s complaints of memory and concentration issues in the context of his medication, but he also noted that his mental status exams were normal, with normal concentration, memory and judgment.  Id.  In addition, Dr. Deloy noted that Mr. G.'s provider "specifically addressed concentration, and that he was sharp and able to report things fine during appointment."  Id.  Dr. Deloy[7] noted

---

[7] The parties mistakenly attributed this and the following findings to Dr. Carter-Visscher.  See Docket No. 32 at p. 38.

references to delusional religious thoughts, but observed that there were no indications of whether the delusions affected Mr. G.'s functioning.  Id. Dr. Deloy noted that Mr. G.'s interactions with his providers were normal, and the treatment notes indicated only one panic attack over a thirty-day period. Id.

### 4.    Dr. Carter-Visscher

In February 2017, Robin Carter-Visscher, Ph.D., reviewed the medical evidence of record and completed a Psychiatric Review Technique (PRT) form. AR248-49.  Dr. Carter-Visscher opined that Mr. G. had a depressive and/or bipolar disorder and anxiety disorder.  AR248.  She opined that Mr. G.'s abilities to understand, remember, and apply information, interact with others, and concentrate, persist, and maintain pace were mildly limited.  Id. Regarding the ability to adapt or manage himself, Dr. Carter-Visscher opined that Mr. G. had no limitations.  Id.  She opined that Mr. G.'s mental impairments were non-severe.  AR248-49.

Dr. Carter-Visscher noted that, during the reconsideration period, Mr. G. continued to seek routine, monthly treatment for his mental impairments, and that his conditions appeared to be somewhat improved and were well-managed on his current medications.  AR249.  She further noted that Mr. G.'s treatment provider stated that Mr. G.'s bipolar disorder was in partial remission with medication management, and his mental status exams were normal.  Id. Dr. Carter-Visscher also noted that Mr. G. told his treatment provider that he

was unable to work due to his physical condition rather than his mental condition.  Id.

Dr. Carter-Visscher affirmed Dr. Deloy's finding that Mr. G.'s mental impairments were non-severe.  AR249.

**D.    Medical Source Statements Submitted by Mr. G.**

**1.    APRN-CNP Johnson's Opinion**

In April 2018, APRN-CNP Johnson submitted a medical source statement on Mr. G.'s behalf.  AR1077-79.  She listed Mr. G.'s diagnoses as bipolar I and personality disorder NOS with mixed features.  AR1077.  APRN-CNP Johnson reported the following symptoms: loss of interest in activities; appetite disturbance with weight gain; sleep disturbance at times; psychomotor agitation or retardation; episodic decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking as an ongoing chronic issue; and paranoid thinking.  Id.

APRN-CNP Johnson opined that Mr. G.'s depression caused moderate restrictions in his activities of daily living and marked restrictions in his ability to maintain social functioning.  AR1077.  She also opined that Mr. G. had deficiencies of concentration, persistence, or pace that resulted in frequent failure to complete tasks in a timely manner and repeated episodes of decompensation in work or work-like settings which caused him to withdraw from the situation or experience exacerbation of signs and symptoms.  Id.

APRN-CNP Johnson opined that Mr. G. had a marked impairment in his abilities to perform activities within a schedule, maintain regular attendance,

and be punctual within normal tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  AR1078.

APRN-CNP Johnson opined that Mr. G. had a moderate impairment of his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with and proximity to others without being distracted by them; make simple work-related decisions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  AR1078-79.

APRN-CNP Johnson opined that Mr. G. had no significant impairment of his abilities to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; interact appropriately with the general public; ask simple questions to request assistance; and to be aware of normal hazards and take appropriate precautions.  AR1078-79.

As support for her opinion, APRN-CNP Johnson stated that Mr. G. showed moderate symptoms with his inability to complete tasks or set

achievable goals for himself.  AR1079.  She also stated that Mr. G. was highly sensitive to criticism and that he tended to be verbally reactive.  Id.  APRN-CNP Johnson stated that Mr. G. had lost jobs due to his reported inability to follow rules, accept criticism, complete basic work duties, and make independent decisions.  Id.  APRN-CNP Johnson related Mr. G.'s report of panic attacks that affected his ability to engage at work which "cost him his employment."  Id. She stated that Mr. G. also experienced delusional thoughts, broadcasting, and thought insertion, though they seemed to be mood neutral delusions.  Id.

### 2.     Dr. Richardson's Opinion

In June 2018, James Richardson, M.D., authored a letter in response to Mr. G.'s request for a "note in support of disability."  AR3639.  Dr. Richardson stated that Mr. G.'s disability claim was three-pronged due to injury in a motor vehicle accident that resulted in five fractured thoracic vertebra, a fractured rib, and a fractured clavicle; mental health issues due to bipolar type I disorder; and cognitive limitations.  Id.

Dr. Richardson described Mr. G.'s thoracic fusion repair and stated that Mr. G. had ongoing issues with "discomfort."  AR3639.  Dr. Richardson stated that Mr. G. told him that the surgeon released Mr. G. from further care, but that "there is some poor clarity in terms of his physical limitations" and that the "family seems to believe he was told he had a 8 pound lifting limitation." Id.

Dr. Richardson described Mr. G.'s job working at an indoor pool for approximately 16 hours a week, Mr. G.'s workplace injury from lifting a

garbage can, a reduction in his hours, and Mr. G.'s eventual discharge "evidently" because of complaints of inappropriate comments to patrons. AR3639.

Dr. Richardson noted that Mr. G. was able to exercise four times weekly and that he taught Taekwondo to children. AR3639. He stated that he had not seen Mr. G. in three years and felt "limited in quantifying his physical limitations" and "he appears to be a robust, healthy male." Id.

Dr. Richardson stated that he "thought" Mr. G.'s mental health was his most disabling issue. AR3639. Dr. Richardson listed Mr. G.'s diagnosis of bipolar I disorder, but also mentioned that at other times he "carried diagnosis of schizo-affective, delusional, anxiety, and has episodes of hallucinations." Id. Dr. Richardson stated that Mr. G.'s current medications were Risperidone, Depakote, Celexa, and Ativan. AR3640. Dr. Richardson stated that Mr. G. gained 75 pounds due to his medication. Id. Dr. Richardson also noted that Mr. G. had become increasingly paranoid, thinking his co-workers were reading his mind and were after him for his religious beliefs. Id.

Dr. Richardson described Mr. G.'s initial development of symptoms some three years prior to his alleged disability onset date. AR3639. He stated that things "f[e]ll apart on him" and he "got to [the] point where he was failing—he was not buying groceries [and] sleeping poorly," at which time he returned to his hometown and moved in with family. AR3639-40. Dr. Richardson stated that Mr. G. blamed mental health issues for his last two employment failures. AR3640. Dr. Richardson noted Mr. G.'s report that he was terminated at Joe

46

Foss Airport and at the indoor pool due to "inappropriate comments to customers". Id.

Dr. Richardson stated that Mr. G. could not seem to "hold relationships" together and that his last romantic relationship was in 2013 and he was unable to name a "best" friend. AR3640. Dr. Richardson noted that he "was not aware" of Mr. G. being employed after October 2017. Id.

Dr. Richardson stated that Mr. G. had a "lifelong history" of cognitive issues, and recited Mr. G.'s participation in special education classes due to his issues with reading comprehension and math. AR3640. Dr. Richardson stated that, though Mr. G. needed special accommodations for some classes, he graduated from high school. Id. Dr. Richardson opined that "[t]his is going to limit his ability to be retrained should he retain long term physical limits and not be able to participate in manual labor occupations." Id.

Dr. Richardson recommended orthopedic input and a functional capacity determination. AR3640. He also suggested that Mr. G.'s difficulty "retraining" could be better quantified with a neuropsychiatry examination. Id.

### 3.    Dr. Sibson's Opinion

In July 2018, Jason Sibson, Psy.D., saw Mr. G. for a diagnostic interview and psychological testing for purposes of diagnostic clarification and treatment planning. AR3642-43. Dr. Sibson administered the MMPI-2-RF and the

MCMI-IV.[8]  AR3642.  Dr. Sibson did not include the test results with his report.  AR3642-43.

Dr. Sibson included a summary of his findings and noted that Mr. G. appeared to have a history of authentic manic episodes dating back to 2013, and perhaps earlier.  AR3642.  He reported that Mr. G.'s manic episodes were characterized by elevated mood and energy, and included inflated self-esteem, grandiosity, markedly decreased need for sleep, more rapid speech, flight of ideas, distractibility, and an increase in goal-directed activity.  Id.  Dr. Sibson stated that the episodes were easily recognizable and "worrisome" to those around him, caused impairment in functioning, and were often associated with persecutory delusions and anxiety.  Id.

Dr. Sibson stated that testing data supported the presence of prominent persecutory ideation that rose to the level of paranoid delusions, other unusual thoughts and perceptual process, and intense anxiety, typically during manic episodes.  AR3642.

Dr. Sibson reported that Mr. G. experienced periodic depression accompanied by diminished interest and pleasure, energy loss, and fatigue.  AR3642.

Dr. Sibson assessed Mr. G. with bipolar I disorder, most recent episode depressed, with psychotic features and anxiety.  AR3642.  He recommended

---

[8] These tests are, respectively, the Minnesota Multiphasic Personality Inventory, Second Edition, and the Millon Clinical Multiaxial Inventory, Fourth Edition.

consultation with Mr. G.'s prescribing treatment provider and ongoing individual psychotherapy.  Id.

In September 2018, Dr. Sibson submitted a medical source statement on Mr. G.'s behalf.  AR3673-75.  He listed Mr. G.'s diagnoses as bipolar I disorder with psychotic features and anxious distress.  AR3673.  Dr. Sibson reported the following symptoms: depressed mood; diminished interest in activities; appetite disturbance with change in weight; sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; pressured speech; flight of ideas; inflated self-esteem; decreased need for sleep; distractibility; and involuntary, time-consuming preoccupation with intrusive, unwanted thoughts or repetitive behaviors aimed at reducing anxiety.  Id.

Dr. Sibson opined that Mr. G.'s mental disorder had been serious and persistent for at least two years, and that Mr. G. had received ongoing medical treatment, mental health therapy, psychosocial support, or a highly structured setting that diminished the symptoms and signs of his mental disorder. AR3673.  Dr. Sibson also opined that Mr. G. had no more than minimal capacity to adapt to changes in the environment or to demands that were not already part of his daily life.  Id.

Dr. Sibson opined that Mr. G. had marked limitations in his abilities to understand, remember, and apply information, and to adapt or manage himself.  AR3674.  Dr. Sibson opined that Mr. G. had mild limitations in his abilities to interact with others, and to concentrate, persist, and maintain pace. Id.

With regard to Mr. G.'s abilities to perform basic work-like mental tasks, Dr. Sibson opined that Mr. G. had moderate limitations in every category. AR3674-75.

Dr. Sibson supported his opinion with the following statement: "When stable, Luke can maintain some focus and a good interpersonal disposition. However, he is prone to manic episodes accompanied by delusion and paranoia, as well as depressive episodes, and these mood states lead to notable functional impairments." AR3675.

### E. Mr. G.'s Self-Reported Limitations

#### 1. Function Report – Adult

Mr. G. completed a Function Report – Adult in December 2016, in which he stated that he lived with family and described injuries to his thoracic vertebra, collar bone, and a rib, and anxiety and depression. AR333.

Mr. G. reported that during the day, he fed his dog and put it outside as necessary, prepared small meals, and showered. AR334. He stated that other family members lifted bags of dog food for him and played fetch with the dog. AR334.

Mr. G. stated that before his injuries, he was able to perform manual labor, do martial arts, and run with his dog. AR334.

Mr. G. reported that pain and anxiety affected his sleep. AR334. With regard to personal care, Mr. G. stated that he needed help with shirts, shoes, and his body brace. Id. He also stated that he showered with a chair and needed help with his body brace in order to use the toilet. Id. Mr. G. reported

that he was independent with regard to all remaining personal care activities, including hair care, shaving, and feeding himself.  Id.

Mr. G. reported that he needed reminders regarding his medicine, but that he needed no reminders regarding his personal needs or grooming. AR335.

Mr. G. reported that he was able to prepare simple meals like frozen foods, eggs, "small meals," and shakes on a daily basis.  AR335.  He stated that since his conditions started, he changed to eating smaller meals.  Id.

Mr. G. stated that he was able to sort laundry, but that he did not do house or yard work because of physical limitations, weight limits, and problems with range of motion.  AR335-36.

Mr. G. represented that he left the house daily, and that when he went out, he walked or drove.  AR336.  He also stated that he was able to leave home alone.  Id.  Mr. G. reported that he shopped by phone and in stores, but that he needed help to carry groceries.  Id.

Mr. G. stated that he was able to pay bills, count change, and handle checking and savings accounts.  AR336.

Mr. G. stated that his hobbies were reading, watching television, playing video games, motor cross, martial arts, and hiking.  AR337.  He stated that he engaged in those activities two to three times a week, but that he had been unable to engage in motor cross, martial arts, and hiking since his accident. Id.

Mr. G. reported that he spent time with others at family functions a few times a month.  AR337.  He stated that he also attended church a few times a month and attended physical therapy two days a week.  Id.  Mr. G. denied having any problems getting along with others but said that he was unable to participate in social activities since his accident.  Id.

Regarding his functional abilities, Mr. G. reported that he had trouble with lifting, bending, standing, walking, kneeling, stair climbing, and reaching, but denied problems with sitting, squatting, and using his hands.  AR338.  Mr. G. elaborated, stating that he was able to lift up to five pounds, and his range of motion was limited due to his spinal fusion.  Id.  He represented that he was able to walk up to two blocks before having to rest for two minutes.  Id.  Mr. G. reported that his doctor prescribed a brace for him, and said that he wore it all the time, except when he slept.  AR339.

Mr. G. also said that he had problems with memory, understanding, concentration, following directions, and completing tasks due to his anxiety and depression, but denied problems getting along with others.  AR338.  Mr. G. explained that his attention level varied depending on his interest, but that he did well with written instructions.  Id.  Mr. G. said that he sometimes needed reminders, but also did "okay" with verbal instructions but sometimes needed reminders.  Id.  Mr. G. admitted that he got along well with authority figures and stated that he never lost a job due to problems getting along with others.  AR339.  Mr. G. reported that he did not handle stress or changes in routine

well.  Id.  He stated that he experienced anxiety driven manic behavior at times and he was fearful of "world issues."  Id.

Mr. G. listed his current medications as diazepam, Celexa, Depakote, and lorazepam.  AR340.  He stated that diazepam caused fatigue and weakness, lorazepam caused fatigue, and Depakote caused weight gain.  Id.

### 2.    Disability Report – Appeal (March 2017)

In a Disability Report – Appeal submitted in March 2017, which asked whether there had been any change in his condition, Mr. G. stated, "[y]es," and "autism."  AR344.  He stated that he had trouble with social skills, and the ability to communicate and interact, which caused panic episodes and anxiety. Id.  Mr. G. also stated that he had a new condition, and he listed bipolar disorder.  Id.  Mr. G. stated that he had a lot of periods of elation and depression, along with mood swings.  Id.

Mr. G. listed his current medications as citalopram, Depakote, and diazepam.  AR347.  He did not list any side effects.  Id.

The form also inquired about changes in daily activities since Mr. G.'s last report.  AR347.  Mr. G. reported that there had been changes, and listed "social activities social anxiety, not much in change, but always [a] constant challenge."  Id.  Mr. G. denied any change in his work situation since his last report.  AR348.

### 3. Disability Report – Appeal (August 2017)

In a Disability Report – Appeal submitted in August 2017, which asked whether there had been any change in his condition, Mr. G. stated, "[n]o." AR364.

Mr. G. listed his current medications as citalopram, Depakote, diazepam, and lorazepam. AR366. He stated that citalopram made him feel tired and nauseated, Depakote caused him to gain weight, and lorazepam affected his appetite. Id.

The form also inquired about changes in daily activities since Mr. G.'s last report. AR367. Mr. G. reported that there had been changes and listed "[f]ocusing on home tasks. Loss of interest in working out. I struggle with social situations." Id.

Mr. G. denied any change in work since his last report. AR367.

### F. Limitations Reported by Others

### 1. Third Party Function Report (Sara G.)

In April 2017, Sara G., Mr. G.'s sister, completed a Function Report – Adult – Third Party, in which she reported that she saw Mr. G. a few times a week when she helped him around the house or they "caught up." AR353. Sara stated that it was hard for Mr. G. to focus on simple tasks, and that he needed things repeated numerous times and was easily discouraged. Id. Sara also reported that Mr. G. was in special classes throughout grade school and middle school. Id. She said that Mr. G. had "high anxiety it seems at all times now." Id.

Sara reported that Mr. G. worked out most days, took his dog out, and took numerous naps. AR354. She said that Mr. G. cared for his dog—that he took him for rides and played fetch. Id. Sara stated that Mr. G. started out helping out with their mother, but that their mother takes care of Mr. G. Id. She reported that Mr. G. was "forgetful." Id. Sara explained that their mother sometimes had to feed the dog, and their mother also helped Mr. G. with his bills, medications, chores, and daily living tasks. Id.

Sara stated that before Mr. G. was injured, he was a dedicated Taekwondo student, and he was focused and social. AR354.

Sara stated that Mr. G. slept more often than he used to sleep and had a "restless mind." AR354. Except that Mr. G. sometimes forgot to eat due to lack of appetite, he was able to meet all of his personal care needs independently. Id.

Sara reported that Mr. G. needed reminders regarding his medicine, but that he needed no reminders regarding his personal needs or grooming. AR355.

Sara stated that, though their mother sometimes prepared meals, Mr. G. was able to prepare meals for himself, and did so on a daily basis. AR355. She stated that Mr. G. did not have much of an appetite since his conditions began. Id.

Sara reported that Mr. G. was able to perform household chores if he had a list or someone gave him reminders. AR355.

Sara stated that Mr. G. went outside frequently, and that when Mr. G. went out, he walked, drove, or rode in a car. AR356. She also stated that Mr. G. was able to leave home alone. Id. Sara reported that Mr. G. shopped by computer and in stores, but that the trips were short because he found it overwhelming to be around too many people. Id.

Sara stated that Mr. G. was able to pay bills, count change, and handle checking and savings accounts. AR356. She also stated "[t]hese questions could be No at times as well." Id. Sara reported that Mr. G.'s ability to handle money changed after his conditions began, e.g., "[h]e has become very forgetful." AR357.

Sara stated that Mr. G.'s hobbies were working on vehicles, running, and working out. AR357. She said that Mr. G. used to ride dirt bikes and do Taekwondo but did not engage in those activities any longer. Id.

Sara reported that Mr. G. engaged more with family and friends in the past few years, and that he did so on a daily and weekly basis. AR357. She denied that Mr. G. needed reminders to go places or that he needed someone to accompany him. Id. Sara stated that Mr. G. had problems getting along with others because Mr. G. thought people talked about him and he often mentioned it in social settings. AR358. Sara also reported that Mr. G. felt that others could read his mind, and that he did not trust people like he once did. Id.

Regarding Mr. G.'s functional abilities, Sara reported that Mr. G. had no limitations with regard to lifting, standing, walking, sitting, squatting, bending,

kneeling, stair climbing, reaching or using his hands. AR358. Sara reported that Mr. G.'s doctor prescribed a brace for him, which he used daily for ninety days. AR359. She stated that Mr. G. currently used the brace as needed. Id.

Sara said that Mr. G. had problems with talking, hearing, memory, understanding, concentration, following instructions, completing tasks, and getting along with others. AR358. Sara reported that Mr. G. had become "disconnected" and had a hard time talking with people in social settings and needed reminders to complete tasks. Id. She said that Mr. G. did not fully understand the "issues/daily conversations people have" and it affected how he followed instructions. Id. Sara said that Mr. G. could pay attention for five to ten minutes at a time and was able to follow written instructions okay. Id. She stated that Mr. G. was not very good with oral instructions. Id. She admitted that he got along well with authority figures but said that he was laid off by an employer for unknown reasons. AR359. Sara reported that Mr. G. did not handle stress or changes in routine well. Id. She stated that he recently had a manic episode "due to medications or lack thereof." Id.

Sara listed Mr. G.'s current medications as Depakote, lorazepam, and citalopram. AR360. She stated that Depakote caused weight gain and drowsiness. Id. She also stated that the lorazepam caused anxiety that has not gotten better. Id. The citalopram side effect was social anxiety. Id.

### 2. Statement of Claimant or Other Person (Sara G.)

In January 2018, Sara completed a Statement of Claimant or Other Person. AR382-86. She stated that Mr. G. has always been "divergent," and

that he attended special education classes which resulted in less homework. AR384. She said that Mr. G. was unable to understand the full curriculum. Id. Sara stated that Mr. G. got overwhelmed, which continued throughout high school. Id.

Sara reported that Mr. G. moved to Rapid City after he graduated from high school. AR384. Sara said that Mr. G. did well during three of the four years he lived in Rapid City. Id. She stated that Mr. G. worked rotating shifts at a lime plant. Id. Sara also stated that Mr. G. was a third-degree black belt and participating in martial arts brought him comfort and joy. Id.

Sara said that, though she thought Mr. G. was doing well, she was wrong. AR384. Sara stated that Mr. G. felt overwhelmed and alone. Id. Over time, Mr. G. became more distant. Id. After talking with the family, Mr. G. decided to move back to Brandon. AR384-85. Mr. G. got a job with Henry Carlson; however, the job required him to go out of town for work; Sara stated that Mr. G. had a mental breakdown. AR385.

Sara reported that Mr. G. was diagnosed with bipolar disorder in 2016. AR385. She said that Mr. G. has had multiple adjustments in his medications since that time. Id. Sara said that Mr. G. had a "distant look" in his eyes and longed for a normal life. Id. She said that Mr. G. felt overwhelmed with simple tasks and found it hard to socialize, even with family. Id.

Sara stated than Mr. G. had been on and off jobs since his diagnosis, and he helped to take care of their mother, who was disabled due to chronic

obstructive pulmonary disease.  AR385.  Sara stated that her mother and brother lost their home and had to find another place to live.  AR386.

Sara stated that Mr. G. continued to go to therapy to better understand his mental disorder.  AR386.  She said that Mr. G. had trouble around too many people from the time he was a young child.  Id.

### 3. Statement of Claimant or Other Person (Scott G.)

In January 2018, Scott G., Mr. G.'s father, completed a Statement of Claimant or Other Person on Mr. G.'s behalf.  AR388-89.  Scott stated that Mr. G. had issues with concentration and focusing on tasks.  AR388.  Scott said that, looking back to when Mr. G. was a child, he believed that Mr. G. had autistic tendencies.  Id.

### 4. Statement of Claimant or Other Person (Tamara G.)

In January 2018, Tamara G., Mr. G.'s mother, completed a Statement of Claimant or Other Person on Mr. G.'s behalf.  AR390-400.  Tamara stated that Mr. G. was shy during preschool and kindergarten, but that he was "ok" by screening standards.  AR392.  When Tamara inquired about holding Mr. G. back a year, the school principal assured her that Mr. G. would do fine.  Id. During first grade, Mr. G. received interventions in reading to assist with building skills and retention.  Id.  Tamara also inquired about auditory issues, but a hearing screening was normal.  Id.  Mr. G. was screened for assistance and ended up with an IEP.  AR393.  Summer school, suggested for skills retention, was not beneficial to him.  Id.

Tamara discussed Mr. G.'s involvement in extracurricular activities during his childhood, including Boy Scouts and football. AR393. In middle school, Mr. G. began Taekwondo, where he found his "niche." Id. Mr. G. also excelled at riding dirt bikes, and he participated in track during high school. Id.

Tamara noted that Mr. G. was always well-behaved during his school years, even though he felt different and classmates sometimes made unkind comments. AR393. She stated that Mr. G. always had trouble reading social cues. AR394. Tamara said that she always felt that something was "missed." Id. She said that she thought that Mr. G. fell through the cracks because he was so well behaved. Id.

Tamara mentioned that Mr. G. always wanted a life and career in Taekwondo and stated that she wondered if that was why school officials did not provide a final vocational assessment before he graduated. AR394.

Tamara related that Mr. G. moved to Rapid City in 2010 after he graduated from high school. AR395. Mr. G. pursued his Taekwondo training and worked full time. AR395. She stated that the family knew and trusted the people he would be around. Id. Tamara said that Mr. G. maintained a "rigid" schedule for two years, and that he called home often and kept himself structured. Id. The family sometimes visited during the weekends and attended Mr. G.'s Taekwondo tests. Id.

Tamara reported that Mr. G. changed over time and fell away from the structures he had put in place. AR395. She stated that promises regarding

Mr. G.'s Taekwondo certification had not been met, his apartment was disheveled (usually organized), and it appeared he was not cooking meals. Id. Tamara stated that Mr. G.'s frame of mind was shifting and said that he called her a few times and expressed seemingly paranoid thoughts. Id.

Tamara stated that Mr. G. returned home a few times, during one of which he saw Dr. Richardson, who diagnosed Mr. G. with depression and prescribed an anti-depressant. AR396. She stated that Mr. G. went back to Rapid City and, though he stopped pursuing Taekwondo, he was still working. Id. He had coworkers and teammates who were good friends. Id.

Tamara reported that Mr. G. had a manic episode during a safety meeting at work. AR396. During a phone call, Mr. G. told her that he thought he was being followed or sought because of his religious beliefs. Id. Tamara said that it was apparent that Mr. G. was overwhelmed, and he agreed to move back home after providing notice—and working two additional weeks—at his job. Id.

Tamara reported that Mr. G. saw a doctor and received a prescription for Zoloft, which she stated made him feel tired. AR397. Tamara stated that Mr. G. felt better at home and began working for Henry Carlson shortly after his return. Id. Mr. G. did well initially, but he experienced paranoid thoughts while out of town for work. Id. He felt that other employees wanted to harm him, and "knew [the] job wasn't for him." Id.

Mr. G. went to work for the local airport after leaving Henry Carlson. AR397. Mr. G. learned things quickly and received compliments regarding his

work.  Id.  Management later called Mr. G. to the office and asked questions about the medications he took.  Id.  Tamara stated that Mr. G. lost his job, and the reason given was "[o]dd behavior, bouncing around, not staying on task, not following directions of what needed to be completed" and concern for Mr. G.'s well-being.  AR398.

Tamara stated that Mr. G. swam for therapy while recovering from his back injury, and that he took a part-time position at Midco Aquatic Center.  AR98.  Mr. G. worked at the aquatic center between March and October 2017 before being discharged.  Id.

Tamara reported that Mr. G. received a diagnosis of bipolar disorder in May 2016.  AR398.  She stated that Mr. G. was prone to wandering thoughts, distraction, or impulsive behavior.  Id.  Tamara also stated that Mr. G. struggled with controlling "panic," had manic episodes if his sleep patterns changed, and he felt that others could read his thoughts and judged his religious beliefs.  Id.  Tamara also related that Mr. G. was easily overwhelmed, sought affirmation from others for decisions or advice on how to handle situations, and had difficulty remembering things.  AR399.  She reported that Mr. G. repeated the same topics daily, and, when working on a task, he appeared unaware of things happening around him—"as if he were wearing blinders."  Id.

## G.    Educational background

Mr. G. had a Test of Auditory-Perceptual Skills (TAPS), completed in the first grade, in April 1999, after his teacher raised concerns about his

academics and his lack of classroom participation. AR3293. The testing revealed weaknesses in auditory-perceptual and language processing skills. AR3294. Mr. G.'s scores on the Peabody Picture Vocabulary and Expressive Vocabulary tests were below average. AR3294-95. Based on his test results, Mr. G. received an IEP due to his primary disability of speech/language disorder. AR3311.

Mr. G. had a Special Education Referral by Miss Roos in March 2000. AR3327. The areas of concern were reading, spelling, math, and vision. Id. Mr. G. continued with his IEP and spent most of his time in a regular classroom with some modifications through May 2000. AR3345.

The following year, Mr. G. underwent a multidisciplinary evaluation due to concerns regarding his academic progress. AR3358. In April 2000, Mr. G. completed the Weschler Intelligence Scale for Children (WISC III). AR3360. His verbal IQ was 83, performance IQ of 87 and full-scale IQ was 84. Id. Scores from 90-109 are considered average. AR3360.

In April 2001, the Brandon Valley School District updated Mr. G.'s IEP. AR3377. The IEP recommended that Mr. G. attend Extended School Year services from: June 18, 2001- July 27, 2001, due to probable regression of his math skills over the summer break. AR3383.

In October 2001, the Brandon Valley School District amended Mr. G.'s IEP. AR3396. The amended IEP called for Mr. G. to receive assistance in the Resource Room for 45 minutes/day in math, 80 minutes/day in written language, 30 minutes/day for reteaching of skills, and 30 minutes/2 times per

week for speech/language.  Id.  Prior to the amendment of the IEP, Mr. G. took the Woodcock Reading Mastery test, which identified his Basic Skills Cluster as 93 and his Reading Comprehension Cluster as 85.  AR3397.  The average range is 90-109.  Id.

In April 2002, Mr. G. received an updated IEP for the 4th grade.  AR3432.  His needs assessment showed that Mr. G. needed to continue working on written language skills and math skills, especially subtraction, multiplication facts and word problems.  Id.  The plan stated that Luke could benefit from continued speech therapy services with the opportunity to participate in a small group, outside of the regular classroom, to gain confidence in his ability to orally express himself and practice with specific language processing skills.  Id.  The plan also indicated that multisensory presentations of new information and directions within the regular classroom would continue to be helpful.  Id.

In March 2003, as part of a three-year multidisciplinary evaluation, Mr. G. underwent a psychological evaluation to determine his current levels of intellectual ability and social-emotional functioning.  AR3473.  The examiner was John Ratzloff.  In Mr. Ratzloff's summary and recommendations, he said: "As measured through review of the WISC-III, [Mr. G.] is categorized as functioning within the low average range of cognitive ability and similar to previous intellectual assessments.  [Mr. G.]'s abilities to sustain attention, concentrate, and exert mental control are a weakness relative to his verbal reasoning abilities."  AR3476.

In April 2003, Mr. G. received an updated IEP.  AR3479.  The IEP noted that Mr. G.'s weaknesses included short-term auditory memory for reversing numbers and repeating sentences, processing directions and more complex questions, receptive and expressive vocabulary knowledge, word retrieval, being precise and specific in choosing words to define, and the understanding and usage of more complex sentence structures.  Id.  It also noted that Mr. G. processed information slowly, and that he needed extra time and rephrasing in order to understand new information or directions.  Id.

In April 2004, Mr. G.'s updated IEP showed that, because of his vocabulary deficits, slower processing speed, and difficulty with overall comprehension skills, he needed extra assistance within the Resource Room to complete academic work.  AR3547.

In the 7th grade, Mr. G.'s April 2005 IEP indicated that his main area of concern was money.  AR3561.  Mr. G. was able to count groups of similar coins with 90% accuracy and in a combination of coins with 85% accuracy, but he was unable to independently give back change of any amount.  Id.  The IEP stated that Mr. G. was aware that money was difficult for him but that he often shut down before even attempting money problems.  Id.

In February 2006, the school district reevaluated Mr. G., and he took the Wechsler Intelligence Scale for Children IV (WISC-IV).  AR3599.  Test results showed that Mr. G.'s full scale IQ was 89, falling in the Low Average range of intellectual functioning at the 23rd percentile compared to children of his age.  AR3600.  Mr. G. also took the Woodcock-Johnson III Tests of Achievement, the

65

results of which showed that Mr. G. was in the low range in math and writing composite. TR3605. Mr. G. scored in the average range on the reading skills cluster and in the low average range in math reasoning. Id.

Mr. G.'s March 2006, IEP stated that Mr. G.'s general intellectual functioning measured in the low average range with slightly better developed nonverbal abilities. AR3571. His perceptual reasoning skills and working memory skills were average, and his verbal comprehension skills and processing speed were in the low average range. Id.

Mr. G.'s March 2007 IEP noted that Mr. G. and his mother each completed a Transition Rating Scale. AR3590. In the employment section, Mr. G.'s mother responded that he would be able to do many of the items that were listed on the assessment, and all of the employment skills. Id. However, Mr. G. said that he was unable to access various resources for assistance in job searching. Id. The IEP indicated that Mr. G. did not have a realistic expectation for his vocational potential, as he mentioned an interest in the FBI and dirt bikes. Id. Mr. G. also stated that he thought he needed to keep working on acting appropriately in public, managing money responsibly, and understanding basic parenting skills. Id.

### H.    Testimony at the ALJ Hearing

#### 1.    Mr. G.'s Testimony

At the June 14, 2018,[9] administrative hearing, Mr. G. testified to the following: He completed high school and had an IEP while attending school. AR213. At the time of the hearing, he lived with his mother. AR183, 205. Mr. G. was left-handed. AR183.

From 2010 to 2012, Mr. G. worked twelve hour shifts at Pete Lien & Sons as a kiln assistant and heavy equipment operator. AR185, 206. He testified that it was a strenuous job, and he had to lift between one hundred and one hundred fifty pounds. Id. Mr. G. said that he left the job because of his anxiety and he needed to be closer to family. AR207. Mr. G. agreed with his attorney when asked if it was because he "[c]ouldn't take care of [himself] anymore." Id.

Mr. G. testified that he worked at Sioux Falls Regional Airport Authority in 2015. AR185-86. He stated that he worked on runway lights, runway signs, mowed lawns, and plowed snow. AR186. Mr. G. said that he lifted items weighing up to one hundred pounds when he worked at the airport. AR206. Mr. G. explained that he lost his job due because his supervisor determined that he "wasn't following instructions" and that he had hung signs in the wrong locations. AR186, 207. Later in the hearing, Mr. G. testified that he had

---

[9] The parties' Joint Statement of Material Facts states the ALJ hearing took place on January 11, 2018. See Docket No. 32 at p. 60. However, the record reflects the hearing took place on June 14, 2018. AR175, 178.

attendance issues while working at the airport, and those issues contributed to his discharge. AR207.

Mr. G. also testified that he worked at Midco Aquatic Center as a janitor for six to eight months in 2017, but his job ended because he engaged in inappropriate "locker room talk." AR186-87, 208. In response to his attorney's questioning, Mr. G. stated that he fantasized about the lifeguards and had trouble concentrating. AR208. At the time of the hearing, Mr. G. worked part-time at a martial arts center and earned about $40 a month. AR187, 202-03.

Mr. G. testified that he injured his back during a dirt bike accident in September 2016, and that he underwent a T3-T8 fusion surgery shortly thereafter. AR187-88, 208, 216. He testified that he still had pain at the time of the hearing, and that his entire back hurt all day, every day. AR188-89. Later in the hearing, Mr. G. told his attorney that the pain in his back "la[id] [him] up" for "over 15 days a month." AR220. Mr. G. was wearing a back brace at the time of the hearing, and he testified that he wore the brace when his pain was substantial, e.g., an 8 on a scale of 1 to 10. AR189. Mr. G. stated that he wore it when he had to sit or stand for long periods because it helped stabilize his back. Id. Mr. G. said that he was able to wear his brace while working at the Aquatic Center, but he rarely used it. AR189-90. He testified that he took over the counter medication for his pain. AR190.

Mr. G. testified that his physicians felt that "[his] back was good," but that he disagreed. AR190. He testified that, even though Dr. Wellman released him without restrictions, he had trouble performing work at the aquatic center

when it required bending or rotating.  AR191.  Because of the fusion, Mr. G. did not think he could perform a job that required him to bend or twist his back.  AR209.  He also testified that he would find it hard to climb, balance, use a ladder, stoop, kneel, crouch, and crawl because of issues with range of motion in his back or because it would cause pain.  AR209-10.

Mr. G. testified that he underwent surgery for a fractured left clavicle at the time of his accident and said that he had a permanent plate in his shoulder.  AR191, 216.  He said that he continued to have pain in his shoulder approximately four times a week.  Id.  Mr. G. testified that he could lift his left arm over his shoulder—though it might hurt when he first woke up in the morning.  AR192.  Mr. G. also stated that he was able to reach from side to side with his left arm.  Id.  He testified that he could lift and carry eight to ten pounds comfortably.  AR193, 210.  However, he also stated that, though it might be "tough," he could probably pick up a case of soda (24 cans) from the floor if he used proper technique and wore his brace.  AR193-94.

Mr. G. testified that he had a driver's license and could drive for up to an hour at a time, and that he would have some discomfort after sitting for that period of time.  AR183-84.  Later in the hearing, Mr. G. testified that he was unable to sit for more than thirty minutes at a time due to back pain.  AR194.  Mr. G. also testified that he was able to stand for thirty to forty-five minutes at a time and walk for approximately a half mile before having to rest.  AR194-95.  Later in the hearing, Mr. G. stated that he would need to alternate sitting and standing every ten to forty-five minutes depending on his pain or mental

situation.  AR216-17.  He said that he would be unable to perform a job with a sit/stand option due to problems with anxiety and concentration.  AR217.

Mr. G. testified that that he was unable to jog or run.  AR195.  He also stated that he no longer participated in martial arts, though he did demonstrate techniques to the children in his classes.  Id.  Mr. G. said that he would not be able to work full time as a martial arts instructor because of his anxiety.  AR212-13.

Mr. G. said that he was able to perform household chores, including sweeping and vacuuming.  AR195, 206.  He also cooked and did dishes.  AR195-95.  However, in response to his attorney's questioning, Mr. G. stated that his mother took care of "almost everything," including cooking, doing the dishes, and taking out the trash.  AR205-06.

Mr. G. testified that he enjoyed listening to music, watching television and martial arts videos, and walking his dog.  AR196, 198, 216.  He also read the Bible, martial arts books, and survival books.  AR212, 218.

Mr. G. said that he tended to avoid people.  AR197.  He also testified that, when was working, he preferred to work on his own, but admitted that there were a few coworkers with whom he interacted.  AR197.  Mr. G. testified that he had no trouble getting along with supervisors.  Id.  Mr. G. testified that he had few people in his life, and his mother and his dog were his best friends.  AR213, 217-18.  He stated that he did not have a girlfriend or boyfriend.  AR218.

Mr. G. testified that he tended to forget to refill his pill case, so his mother sometimes had to remind him to take his medication.  AR197.

Mr. G. also said that, while he preferred to shop online, he sometimes went to the store with his mother.  AR197-98, 205.

Mr. G. testified that he had problems with anxiety that pre-dated his dirt bike accident.  AR198.  He described a panic attack that occurred in 2013 or 2014 while he was working in Rapid City and stated that panic attacks causing his heart to pound sometimes made him feel like he was having a heart attack.  AR199.  Mr. G. also testified that he suffered headaches with his anxiety.  Id. He said that his panic attacks lasted between ten and forty-five minutes or stretched as long as "a couple days."  Id.  Mr. G. said that his most recent panic attack lasted an hour.  Id.  Mr. G. testified that he experienced more severe symptoms every two months when he had a manic hallucination state flare up but was unable to state how long those episodes lasted.  AR201.

Mr. G. testified that risperidone, Celexa, Depakote, diazepam, and lorazepam were his current medications, though he only took lorazepam about four times a week—usually during social occasions.  AR200-02.  Mr. G. testified that though he sometimes found it difficult and might have to cut his visits short, he was able to get out of the house and attend small gatherings.  AR201.  While Mr. G. testified that most of his medications were not as helpful as he would like, Depakote in particular did help with his anxiety and panic attacks, especially at a higher dose.  AR202.  He identified drowsiness as a side effect of his medications.  Id.

Mr. G. testified that he experienced sexual thoughts frequently and was concerned that people could read his mind while he was having such thoughts. AR207-08. Mr. G. also thought that others could read his thoughts on a general basis, including the mail carrier or people he saw on television. AR212-13. He testified that he hallucinated about martyrdom or people who were "out to get" him and did not like radical Islam. AR210-11. Mr. G. also said that he sometimes had problems sleeping and when that happened, he thought about the past, Islam, and Christian martyrdom. AR213.

Mr. G. stated that he did not think he could take his medicine and go on to work if he was experiencing paranoia. AR214. He stated that it would affect his ability to attend work once or twice a week. Id. Mr. G. stated that he did not know whether he could perform in a work-at-home setting because he had problems with understanding, memory, and focus. AR218. Mr. G. stated that he needed written instructions and reminders regarding tasks and deadlines. AR219. He stated that when he worked, he had a hard time keeping up with the other employees. AR219. Mr. G. said that when he got stressed or overwhelmed while performing a task, he managed it by walking away and doing something else. AR220.

Mr. G. testified that he had a hard time accepting criticism from others because he took it too personally, and it made him feel depressed or angry. AR215. While Mr. G. might have "felt" like hitting a supervisor, he never did so. Id. He said that he missed social cues and sometimes said the wrong things around coworkers. Id. He responded "yes" when asked if

APRN-CNP Johnson's statement that he lost jobs because of his inability to complete reports, follow rules, accept criticism, complete basic work duties, or make independent decisions was accurate. AR216.

Mr. G. testified that, when he was working and had money, he was able to pay his bills on time. AR203. In response to his attorney's questioning, Mr. G. stated that most of his bills were currently being paid out of his mother's checking account. AR205.

He said that he was slow at figuring change when he paid cash at stores, and that it would be difficult for him to provide change if he was working in a retail environment. AR203-04. Mr. G. also said that he would not perform well if he was expected to write reports or send e-mails, etc., due to problems with his concentration and his need to alternate sitting, standing, and walking. AR204, 216.

### 2. Thomas Audet's Testimony

Thomas Audet testified as a vocational expert at the hearing. AR177-78, 223-28.

During the hearing, the ALJ referenced Exhibit 24-E, in which Mr. Audet characterized Mr. G.'s past work. AR224, 466. The exhibit indicated that Mr. G. had past work as a roofer and a kiln worker, both at the medium exertional level. AR466. The roofing job was skilled labor with a specific vocational level (SVP) of 7 and the kiln job was unskilled work with an SVP of 2. Id. He also identified work as an airport utility worker, which was performed at the heavy exertional level at an SVP of 4. Id. At the hearing,

Mr. Audet stated that the only change he would make based on Mr. G.'s testimony would be the addition of a janitor position at the medium exertional level, and with an SVP of 3. AR224.

The ALJ posed a hypothetical for a younger individual with a high school education and the same work history as Mr. G., with the abilities to lift and carry twenty pounds occasionally and ten pounds frequently; sit for about six hours in an eight-hour workday, but with the option to stand up or change position for two to three minutes after sitting for an hour; stand and/or walk for about six hours in an eight-hour workday; climb ramps and stairs occasionally, but not ladders, ropes, and scaffolds; he could occasionally balance, stoop, kneel, crouch, and crawl; and avoid exposure to hazards such as unprotected heights and moving machinery. AR224-25. In addition, the hypothetical individual would have the abilities to perform simple tasks; maintain concentration, persistence, and pace for two-hour segments of time; respond appropriately to brief and superficial interactions with co-workers, but no interactions with the general public as part of essential job duties. AR225. The ALJ then asked whether such an individual would be able to perform Mr. G.'s past relevant work. Id. Mr. Audet testified that the hypothetical person would not be able to perform Mr. G.'s past relevant work. AR225.

The ALJ then asked whether there were jobs available in the national economy that would be consistent with the limitations in the hypothetical. AR225. Mr. Audet testified that there would be light, unskilled jobs that fit the

hypothetical, and he identified the jobs of electronics worker, package inspector, and bench assembler.  AR225-26.

The ALJ posed a second hypothetical, with the same physical restrictions, but from a mental standpoint, the individual would be limited to simple, routine tasks: and could maintain concentration, persistence, and pace for two-hour work segments.  In addition, due to psychologically based symptoms, this individual would not be able to respond appropriately to interactions with supervisors and would not be able to respond appropriately to the routine changes found in an unskilled work setting.  Id.

Mr. Audet testified that the hypothetical individual would have to be able to respond to supervision at times, and that a person who was unable to do that appropriately or to respond to changes in workflow or assignments would be a person who was not competitively employable.  AR226-27.

Mr. G.'s attorney elected not to examine Mr. Audet.  AR227-28.

The ALJ asked Mr. Audet whether his testimony was consistent with the Dictionary of Occupational Titles (DOT).  AR228.  Mr. Audet stated that his testimony was consistent with the DOT with regard to the physical and mental demands of the work, and the relevant skill levels.  Id.  Mr. Audet testified that he based his answers regarding responding to supervision and change in the workplace, etc., on his professional experience working with employers and clients in the field of vocational rehabilitation.  Id.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, . . ., and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination."  Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

## B.     The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.

The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not severe) to determine the applicant's residual functional capacity (RFC). If the applicant's

RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(f).

## C.   Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D.   The Parties' Positions

Mr. G. asserts the Commissioner erred in three ways: (1) the ALJ's finding that Mr. G. did not meet the Listing for bipolar disorder at step three

was not supported by substantial evidence in the record; (2) the ALJ's

formulation of the RFC was not supported by substantial evidence in the

record; and (3) the ALJ improperly evaluated the opinion evidence in the

record.

The Commissioner asserts the ALJ's decision is supported by substantial

evidence in the record and the decision should be affirmed. The Commissioner

also asserts the ALJ properly explained its evaluation of the opinion evidence in

the record.

## E.    Analysis

Mr. G.'s assignments of error are discussed in turn below.

### 1.    Whether the ALJ's Finding that Mr. G. Did Not Meet Listing 12.04 Was Supported by Substantial Evidence

Mr. G. alleges the ALJ erred at step three of the sequential analysis by

determining that he did not meet or equal listing 12.04 for depressive, bipolar,

and related disorders.  If a claimant has an impairment that "meets or equals"

a Listing, the claimant is disabled.  20 C.F.R. § 404.1525.  The Listings

describe various physical and mental impairments categorized by the body

system they affect.  20 C.F.R. § 404.1525.  If the claimant has one of the listed

impairments, the step-three analysis requires comparing the findings of the

claimant's impairment with the Listing.  Id.  If the claimant's findings for his or

her impairment meet or equal the Listing, he or she is presumed disabled.  Id.

However, "[a]n impairment that manifests only some of [the Listing's] criteria,

no matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521,

530 (1990).  The burden is on the claimant at step three to demonstrate that

his or her impairments meet or equal a listing, and it is not upon the Commissioner to show that the claimant does not satisfy a listing. <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004); 20 C.F.R. § 404.1520(d).

The standard for medical criteria of the Listings is at "a higher level of severity than the statutory standard [for disability]." <u>Sullivan</u>, 493 U.S. at 532. "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.' " <u>Id.</u> The Listings were intended to operate as a presumption of disability, making further inquiry unnecessary. <u>Id.</u> By design, then, the Listings are more restrictive than the statutory disability standard. <u>Id.</u>

Bipolar disorder is a listed impairment under Listing 12.04 (depressive, bipolar, and related disorders). Therefore, if Mr. G. met the requirements of Listing 12.04, the ALJ should have found him disabled without further inquiry. To prove he met Listing 12.04, Mr. G. was required to show the following:

**12.04 Depressive, bipolar and related disorders (see 12.00B3), satisfied by A and B, or A and C:**

A. Medical documentation of the requirements of paragraph 1 or 2:

1. Depressive disorder, characterized by five or more of the following:

   a. Depressed mood;

   b. Diminished interest in almost all activities;

   c. Appetite disturbance with change in weight;

   d. Sleep disturbance;

    e.  Observable psychomotor agitation or retardation;

    f.  Decreased energy;

    g.  Feelings of guilt or worthlessness;

    h.  Difficulty concentrating or thinking; or

    i.  Thoughts of death or suicide.

2. Bipolar disorder, characterized by three or more of the following:

    a.  Pressured speech;

    b.  Flight of ideas;

    c.  Inflated self-esteem;

    d.  Decreased need for sleep;

    e.  Distractibility;

    f.  Involvement in activities that have a high probability of painful consequences that are not recognized; or

    g.  Increase in goal-directed activity or psychomotor agitation.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of

the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04 (eff. Mar. 14, 2018).

For purposes of paragraph B, "marked limitation" is defined as "functioning in an area independently, appropriately, effectively, and on a sustained basis is seriously limited." Id. § 12.00F2d. An "extreme limitation" is defined as inability "to function in this area independently, appropriately, effectively, and on a sustained basis." Id. § 12.00F2e. The ALJ will find a "moderate limitation" when "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." Id. § 12.00F2c.

Here, the ALJ found Mr. G. did not satisfy the requirements of either paragraphs B or C. Because he did not satisfy either paragraph, the ALJ concluded that Mr. G. did not meet Listing 12.04 without determining whether Mr. G. met the requirements of paragraph A.

The ALJ considered each of the paragraph B criteria in turn. As for the area of understanding, remembering, and applying information, the ALJ found Mr. G. had a mild limitation. AR15. In support of this conclusion, the ALJ cited mental health treatment records from APRN-CNP Johnson dated January 3, 2017 (AR762), April 3, 2017 (AR787), and November 27, 2017 (AR3234). At

each of these visits, APRN-CNP Johnson noted that Mr. G. had normal memory. The ALJ also noted that, at his consultative examination with Dr. McGrath, Mr. G. recited in detail his daily activities, including remembering to take his dog out three or four times daily. AR3661-62. The ALJ also noted that Mr. G. graduated high school, albeit with an IEP, and that Dr. McGrath found that he had low borderline intellectual functioning (AR3665). The ALJ noted that Mr. G. is able to use a smartphone, teach Tae Kwon Do, and read martial arts books and information about martial arts on the internet; the ALJ found these factors "indicat[e] he has some ability to understand, remember, and apply information." AR15 (citing AR3661-62). Finally, the ALJ noted that the validity of Dr. McGrath's assessment of Mr. G.'s memory functioning was uncertain. AR15-16, 3664-65. Dr. McGrath found Mr. G.'s memory was "relatively poor." AR3665. Based on these medical records, the ALJ found Mr. G.'s ability to understand, remember, or apply information was mildly limited.

In the area of interacting with others, the ALJ found Mr. G. had a moderate limitation. The ALJ noted Mr. G. testified that he tends to avoid other people, would get along with just a few people, but has no problems with supervisors. The ALJ cited medical records from APRN-CNP Johnson dated December 2, 2016 (AR768), July 3, 2017 (AR3137), October 25, 2017 (AR3219-20), and November 27, 2017 (AR3234), which noted Mr. G. had good or appropriate eye contact and/or was cooperative. The ALJ also noted that Dr. McGrath documented that Mr. G. had not developed many friends since

moving back to Brandon, but that he had some friends he saw at Tae Kwon Do. AR3662. Lastly, the ALJ noted that Mr. G. testified he was terminated by the aquatic center for "locker room talk." Based on these medical records and testimony from Mr. G., the ALJ found that Mr. G. had a moderate limitation in interacting with others.

In the area of concentrating, persisting, or maintaining pace, the ALJ found Mr. G. had a moderate limitation. The ALJ noted that Mr. G.'s mother had concerns about Mr. G.'s ability to focus and concentrate, but that Mr. G. demonstrated good concentration at a medical appointment with APRN-CNP Johnson on December 2, 2016. AR768. The ALJ also cited another appointment, this one on December 27, 2016, where Mr. G. appeared at times distracted but his attention was redirected when APRN-CNP Johnson spoke to him. AR764. The ALJ noted that Mr. G. reported to Dr. McGrath that he could drive a car without becoming lost or confused, which indicated he had some ability to concentrate. AR3662. The ALJ also cited Dr. McGrath's conclusion that Mr. G.'s attentional capacities were marginal to fair, resulting in some inefficiency in daily functioning but were not incapacitating. AR3665. Based on this record, the ALJ found Mr. G. was moderately limited in the area of concentrating, persisting or maintaining pace.

In the final paragraph B criterion, adapting or managing oneself, the ALJ found Mr. G. was moderately limited. In support of this finding, the ALJ noted that Mr. G. came to medical appointments dressed casually and/or nicely/well-groomed and specifically referenced records from APRN-CNP Johnson dated

December 2, 2016 (AR768), November 10, 2016 (AR770), and July 3, 2017 (AR3137). The ALJ noted Mr. G. reported to Dr. McGrath that he did some chores, like helping his mother clean and vacuum, take out the garbage, doing dishes, and sometimes mopping. AR3662. Lastly, the ALJ noted that Mr. G. testified his mother helps him with daily activities, but that he cooks simple meals and shops with his mother.

Based upon these medical records and hearing testimony, the ALJ found Mr. G. had a moderate limitation in adapting or managing himself. Considering the limitations it found in the four paragraph B criteria, the ALJ concluded Mr. G. did not meet the requirements of paragraph B because his mental impairments did not cause at least two marked limitations or one extreme limitation.

In this appeal, Mr. G. argues the ALJ improperly rejected the opinions of Dr. Richardson, Dr. McGrath, Dr. Ferguson, and APRN-CNP Johnson in finding that he did not meet the requirements of Listing 12.04. But the ALJ discussed these opinions at step four, not step three, and the ALJ's step-four discussion did not mention how these opinions relate to Listing 12.04. Instead of challenging specific findings the ALJ made as to the subparts of Listing 12.04's requirements (e.g., by arguing that the medical records cited by the ALJ do not support its findings as to paragraphs B and C), Mr. G. simply recites evidence from these opinions that runs contrary to those findings. To the extent the contents of these opinions bear on the ALJ's determination at step three, especially as to whether Mr. G. was moderately or markedly impaired in any

paragraph B areas, the court considers the ALJ's evaluation of them in section E.2. herein. Notably, the ALJ at step four rejected the marked limitations to paragraph B criteria contained in these opinions.

The only opinion the ALJ specifically considered in the context of Listing 12.04 was Dr. Sibson's September 2018 medical source opinion submitted by Mr. G.'s attorney after the ALJ hearing and consultative examination by Dr. McGrath. Considering the functional areas of the paragraph B criteria, Dr. Sibson opined that Mr. G. had marked limitations in his abilities to understand, remember, or apply information, and adapt or manage oneself and mild limitations in his abilities to interact with others and concentrate, persist, or maintain pace. AR3674. The ALJ gave Dr. Sibson's opinions as to these paragraph B criteria little weight because, although Dr. Sibson found marked limitations in two of the paragraph B criteria, he found only moderate limitations in all of Mr. G.'s work-related abilities. AR29, 3674-75. This included moderate limitations in such work-related abilities as understanding, remembering, and carrying out detailed instructions. AR3674.

In addition to giving Dr. Sibson's opinions of Mr. G.'s functional limitations little weight because they were internally inconsistent, the ALJ found the marked limitations noted by Dr. Sibson were not supported by the record. The ALJ cited numerous specific medical records that showed that Mr. G. had no more than moderate limitations in the paragraph B criteria. AR29. To the extent Mr. G. asserts that the ALJ improperly evaluated

Dr. Sibson's opinion outside the scope of Listing 12.04, the court considers that issue in section E.2. herein.

Instead of explaining how the ALJ erred in evaluating Dr. Sibson's opinion as paragraph B, Mr. G. merely recites the opinion. This recitation does nothing to challenge the ALJ's evaluation of the opinion, which was clearly contained in its written decision. It is Mr. G.'s burden to show how the ALJ erred in evaluating whether he met the Listing, and simply parroting the evidence the ALJ considered and rejected does not meet that burden. Accordingly, Mr. G. has not shown the ALJ's finding that he did not satisfy the paragraph B criteria is not supported by substantial evidence in the record.

However, Mr. G. need not satisfy the criteria of paragraphs A and B to meet Listing 12.04; he could satisfy the criteria of paragraphs A and C instead. As for paragraph C, the ALJ found "the evidence fails to establish the presence of the 'paragraph C' criteria." AR16. The ALJ, in finding that the record contained no evidence of these criteria, cited no evidence in the record.

Paragraph C, put plainly, requires Mr. G. to show three things: (1) the medical documentation shows the existence of bipolar I over a period of at least two years, (2) medical treatment, mental health therapy, or other support that is ongoing and that diminishes the symptoms of bipolar I, and (3) that he has only minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.

The court therefore considers whether Mr. G. met his burden of showing that he satisfied the paragraph C criteria, i.e., whether the ALJ's finding that he did not is supported by substantial evidence in the record.

To satisfy the first requirement of paragraph C, Mr. G. needed to present medical evidence of the existence of bipolar I over a period of at least two years. The ALJ did not make any findings related to this requirement. Mr. G. was diagnosed with bipolar I on July 14, 2016. AR589. The medical records thereafter consistently affirm Mr. G.'s diagnosis of bipolar I through Dr. Sibson's September 26, 2018, medical source opinion—the most recent medical evidence in the record before the ALJ. AR3673. Clearly there is substantial evidence in the record of a medically documented history of bipolar I over a period of at least two years.

The second paragraph C criterion (designated C1 in the appendix) requires Mr. G. to demonstrate that he received some ongoing medical or mental health intervention or support that diminished the symptoms of his bipolar I disorder. The ALJ concluded he did not meet this burden, finding, "[t]he record does not demonstrate medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that diminishes the symptoms and signs of the claimant's mental disorders, with the claimant achieving only marginal adjustment." AR16. The ALJ did not cite or distinguish any evidence in the record to support this conclusion. The ALJ's decision contains no further explanation of the reasoning undergirding this conclusion.

Appendix 1 of 20 C.F.R. part 404, subpart P, instructs that the Commissioner "consider[s] that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practices for the type of treatment or evaluation required for your medical condition." Id. § 12.00G2b.

Section 12.00D4 describes what the Commissioner will consider "treatment" for purposes of paragraph C2. "Treatment may include medication(s), psychotherapy, or other forms of intervention, which you receive in a doctor's office, during a hospitalization, or in a day program at a hospital or outpatient program." Id. Based upon the Commissioner's definition of "treatment," it appears Mr. G. received ongoing treatment in the form of medications.

Mr. G. provided the ALJ medical records documenting his mental health therapy and medical treatment for bipolar I disorder. These records show that Mr. G. was taking medications for his bipolar I disorder on an ongoing basis for a period of at least two years. The following is a summary of Mr. G.'s treatment for bipolar I relevant to paragraph C.

On July 14, 2016, Dr. Ferguson saw Mr. G. for individual therapy. AR587. Dr. Ferguson noted that she had seen Mr. G. once before for therapy on January 13, 2016, then Mr. G. failed to show up to a "few sessions." AR614-16, 587, 1188-96. Dr. Ferguson diagnosed Mr. G. with bipolar I, unspecified anxiety disorder, and personality disorder NOS with mixed avoidant, paranoid and schizotypal features. AR589, 1009-15.

APRN-CNP Johnson saw Mr. G. on July 20, 2016, for medication management. AR1325-45.

APRN-CNP Johnson saw Mr. G. again on August 3, 2016, for medication management and psychotherapy. AR1397-409.

Mr. G. was seen by Dr. Ferguson again on August 15, 2016, for a 60-minute therapy session. At this session, Dr. Ferguson confirmed Mr. G.'s July 2016 diagnoses. AR578, 1016-23.

Mr. G. saw APRN-CNP Johnson for medication management and 25 minutes of psychotherapy on December 2, 2016. AR767, 769.

Mr. G. saw APRN-CNP Johnson for medication management and brief psychotherapy check-ins on January 3, 2017, February 6, 2017, April 3, 2017, July 3, 2017, August 24, 2017, September 27, 2017, and October 25, 2017. AR780-84, 785-89, 3135-48, 3153-65, 3175-88, 3217-29.

When Mr. G. saw APRN-CNP Johnson for medication management and psychotherapy on November 27, 2017, APRN-CNP Johnson noted that Mr. G. had recently cancelled a therapy session with Kelli Willis. AR3232, 3235. APRN-CNP Johnson also charted that Mr. G. was open to continuing counseling but wanted to look for a different provider. AR3232.

Mr. G. saw NP Wendell-Schechter for medication management and psychotherapy on February 12, 2018. AR3262-74.

Mr. G. was seen by Dr. Sibson on April 25, 2018. AR3635.

On July 31, 2018, Dr. Sibson recommended ongoing individual psychotherapy in his Brief Psychological Assessment Report. AR3642.

Dr. McGrath noted in his August 7, 2018, consultative psychological examination that Mr. G. reported he saw Jason Gibson,[10] a psychologist, for therapy twice per month for the preceding six months. AR3663. Dr. McGrath noted that Mr. G. was still taking Valium, Depakote, Celexa, risperidone, and lorazepam. AR3663.

Although the record from this visit is not contained in the administrative record, Mr. G. was seen by APRN-CNP Johnson on November 13, 2018. AR81.

Contrary to the ALJ's findings, this record shows that Mr. G. received ongoing treatment, as that term is defined by §§ 12.00G2b and D4, in the form of medications.

As for paragraph C1's second requirement—that claimants present evidence that the treatment they received diminished the symptoms and signs of their disorders—there is evidence in the record showing Mr. G.'s bipolar I symptoms were diminished when he was taking his medication.

As the ALJ noted, Mr. G. reported increased symptoms at times when he took his medications inconsistently, and his symptoms subsided after his medications were adjusted. AR29. Most notably, Mr. G. denied experiencing delusions and hallucinations when he was taking his medication. On September 25, 2017, Mr. G. called APRN-CNP Johnson's office, reporting that he felt manic all week and that he had not slept in several days. AR3169. APRN-CNP Johnson instructed Mr. G. to temporarily increase his Depakote dosage and prescribed Risperdal. AR3169. On September 27, 2017, Mr. G.

---

[10] It appears this is a typographical or clerical error and refers to Dr. Sibson.

was seen by APRN-CNP Johnson for medication management. AR3175. APRN-CNP Johnson noted the recent medication adjustments and observed that Mr. G. did not appear fatigued or sedated, and he denied paranoia in the preceding few days and stated he was no longer fixating on the Bible or social media. AR3175. Mr. G.'s anxiety was under control, and he was not feeling depressed or detached from reality. AR3175-76. APRN-CNP Johnson advised Mr. G. to continue taking this combination of medications. AR3179. Because the record reflects that Mr. G.'s mental symptoms improved with medication, he carried his burden to show he met the requirements of paragraph C1. The ALJ's finding that Mr. G. did not meet the requirements of paragraph C1 is not supported by substantial evidence in the record.

The next requirement is that of paragraph C2, which requires a claimant to show they are limited to marginal adjustment, i.e., minimal capacity to adapt to changes in their environment or to demands that are not already part of their daily lives. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04C2. As to this requirement, the ALJ found, "[t]he record does not establish that the claimant has only marginal adjustment, that is, minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." AR16. The ALJ did not support this conclusion with any explanation or citations to the record, e.g., records showing that Mr. G. has greater-than-minimal capacity to adapt to changes in his environment.

In support of his argument that the ALJ erred by finding that he did not meet the requirements of Listing 12.04C2, Mr. G. points to the September 26,

2018, medical source statement of Dr. Sibson. In relevant part, this opinion of

Dr. Sibson's is comprised of a checkmark next to printed text that reads,

"Patient has no more than minimal capacity to adapt to changes in the

environment or to demands that are not already part of his or her daily life."

AR3673 (emphasis omitted). In the same opinion, Dr. Sibson also opined that

Mr. G. had a marked limitation in adapting or managing oneself. AR3674.

However, Dr. Sibson never provided any basis for his conclusion that

Mr. G. met this paragraph C2 requirement. Although the ALJ did not expressly

address Dr. Sibson's opinion as to this paragraph C2 requirement, the ALJ

rejected Dr. Sibson's finding that Mr. G. met the requirements of Listing 12.04.

Courts routinely uphold an ALJ's decision to discount a treating physician's

medical source statement where the limitations listed on the form "stand

alone," and were "never mentioned in [the physician's] . . . records of

treatment" nor supported by "any objective testing or reasoning." Reed v.

Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting Hogan v. Apfel, 239 F.3d

958, 961 (8th Cir. 2001)). Although Dr. Sibson placed a checkmark on the line

stating Mr. G. "has no more than minimal capacity to adapt to changes in the

environment or to demands that are not already part of his or her daily life," he

also opined that Mr. G. was only moderately limited in his abilities to sustain

an ordinary routine without special supervision, to maintain regular

attendance and be punctual within customary tolerances, to work in close

proximity with others without being distracted by them, and complete a normal

workweek without interruptions from psychologically based symptoms and to

94

perform at a consistent pace without an unreasonable number of breaks. AR3674-75. Similarly, APRN-CNP Johnson opined that Mr. G. was only moderately limited in his ability to respond appropriately to changes in the work setting. AR1078. See 20 C.F.R. 404, Subpt. P, App'x 1, § 12.00E4 (discussing work-related examples of the related paragraph B4 area of adapting or managing oneself). This evidence supports the ALJ's conclusion that Mr. G. had more than a minimal capacity to adapt to changes in the environment or to new demands.

While there is evidence in the record supporting a finding that Mr. G. has some limitation in adapting to new environments and stimuli, Mr. G. has not shown that limitation to be so severe that he retains only minimal capacity to adapt. Therefore, substantial evidence supports the ALJ's finding as to requirement C2. Accordingly, although the ALJ's finding that Mr. G. did not meet the requirements of paragraph C1 is not supported by substantial evidence in the record, Mr. G. cannot meet the requirements of paragraph C without meeting the C2 requirements. Because the ALJ's finding as to C2 is supported by substantial evidence, the ALJ properly found that Mr. G. does not meet the requirements of paragraph C. Because the ALJ also properly found Mr. G. does not meet the requirements of paragraph B, the ALJ's finding that Mr. G. does not meet Listing 12.04 is supported by substantial evidence in the record.

Additionally, Dr. Sibson's conclusory statements that Mr. G. met the requirements of paragraphs B and C are not binding on the ALJ. 20 C.F.R.

95

§ 404.1527(d)(2) provides that, although the Commissioner considers opinions from medical sources on issues such as whether a claimant's impairment meets or equals a listing, "the final responsibility for deciding these issues is reserved to the Commissioner."

Mr. G. bears the burden of proof at step three.  Barrett, 38 F.3d at 1024. Mr. G. has failed to show the conclusion of the ALJ at step three is not supported by substantial evidence in the record.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  The court finds the ALJ did not err at step three of the sequential evaluation by finding that Mr. G. did not meet Listing 12.04.

### 2. Whether the ALJ Properly Evaluated the Medical Source Opinion Evidence in the Record

In conjunction with his argument that he met the criteria for Listing § 12.04, Mr. G. argues that the ALJ improperly discounted the opinions of his mental health providers and of the psychological consultative examiner.  Mr. G. also asserts the ALJ improperly evaluated the opinion of the physical consultative examiner.

Medical opinions are evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

  – whether the opinion is consistent with other evidence in the record;

  – whether the opinion is internally consistent;

- whether the person giving the medical opinion examined the claimant;

- whether the person giving the medical opinion treated the claimant;

- the length of the treating relationship;

- the frequency of examinations performed;

- whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

- the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

- whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

- whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'does not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a

treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-54; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

Because Mr. G. has alleged that the ALJ erred by improperly evaluating the opinions of multiple medical sources, the court considers the ALJ's evaluation of each opinion in turn.

### a.    APRN-CNP Johnson

20 C.F.R. § 404.1527 governs the evaluation of medical evidence for all claims filed before March 27, 2017, including Mr. G.'s. Under the regulation, "medical opinions" must come from an acceptable medical source, and only acceptable medical sources meet the definition of a treating source for purposes of 20 C.F.R. § 404.1527(c). Pursuant to the applicable version of 20 C.F.R. § 404.1513(a), acceptable medical sources did not include nurse practitioners when the ALJ denied Mr. G.'s claim.

APRN-CNP Johnson is, under the Social Security regulations, an "other medical source." See 20 C.F.R. 404.1513(d), whose opinion the ALJ is to consider when assessing the severity of an impairment and how it affects Mr. G.'s ability to work. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006), sets the standards for evaluating opinions from "other medical sources." The ALJ is instructed to evaluate a nurse practitioner's opinion according to the same factors that apply to other medical sources as discussed in § 404.1527(c), and an opinion from a nurse practitioner can be used as evidence of the severity of an impairment and how the impairment affects the individual's ability to function. SSR 06-03p, 2006 WL 2329939, at *2.

"In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). Here, the ALJ was required to explain the reasons for the weight it gave APRN-CNP Johnson's opinion if the ALJ found it was entitled to greater weight than a medical opinion from a treating source. See 20 C.F.R. § 404.1527(f)(2) ("[W]hen an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision . . . .). Otherwise, "[t]he adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the

outcome of the case." Id. The court considers the ALJ's evaluation of APRN-CNP Johnson's opinion according to these rules.

APRN-CNP Johnson completed a medical source statement concerning Mr. G.'s mental limitations on April 9, 2018. APRN-CNP Johnson opined that Mr. G. had a moderate restriction to his activities of daily living and a marked limitation in his ability to maintain social functioning. AR1077. Without qualifying the extent of the limitations, APRN-CNP Johnson also opined that Mr. G. experienced deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner and that Mr. G. experienced repeated episodes of deterioration or decompensation in work-like settings which caused him to withdraw from the situation or experience worse symptoms. AR1077.

APRN-CNP Johnson also assessed Mr. G.'s ability to perform work-like tasks. She opined that Mr. G. was not significantly impaired in his abilities to remember locations and work-like procedures, to understand and remember short and simple instructions, to carry out very short and simple instructions, to interact appropriately with the general public, to ask simple questions to request assistance. AR1078. But she opined that Mr. G. had a moderate limitation in his ability to make simple work-related decisions due to indecisiveness. AR1078. APRN-CNP Johnson further opined that Mr. G. had moderate limitations in his abilities to work in coordination and proximity with others without being distracted by them and in maintaining socially appropriate behavior. AR1078. APRN-CNP Johnson stated that Mr. G. had no

significant limitations in his abilities to interact appropriately with the general public. AR1078. In contrast, she did opine that Mr. G. had marked limitations in his abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. AR1078. APRN-CNP Johnson also opined that Mr. G. had marked limitations in his abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and moderate limitations in his abilities to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR1078. Regarding adaptive functioning, APRN-CNP Johnson opined that Mr. G. had moderate limitations in his abilities to adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the workplace, and to set realistic goals, but no significant limitations in his abilities to recognize normal hazards and take appropriate precautions. AR1078-79.

Mr. G. asserts the ALJ "completely rejected the opinions of [APRN-CNP Johnson]" and "gave her opinions no weight[,] finding that she is not an 'acceptable medical source.' " See Docket No. 21 at p. 17. This assertion is not borne out by the record. The ALJ evaluated APRN-CNP Johnson's opinion and gave it "some weight." AR27. The ALJ's RFC finding that Mr. G. should be limited to simple tasks (AR17) is consistent with APRN-CNP Johnson's opinions

101

of Mr. G.'s mild and moderate limitations. The ALJ agreed with APRN-CNP Johnson that Mr. G. has some difficulty with social interactions—e.g., inappropriate "locker room talk." However, the ALJ found that Mr. G. was not markedly limited in his ability to get along with others: "The claimant should not interact with the general public because of his inappropriate comments and should have only brief and superficial interactions with co-workers, but the record does not support greater limitations." AR27.

Mr. G. has not shown that the ALJ improperly evaluated APRN-CNP Johnson's opinion against the record as a whole. Although the ALJ disagreed with portions of the opinion, it credited the parts of the opinion that were supported by medical evidence in the record and provided explanation for its decisions.

And the ALJ's evaluation of APRN-CNP Johnson's opinion is consistent with its step-three finding that Mr. G. had moderate—not marked— impairments in the areas of interacting with others and concentrating, persisting, or maintaining pace. First, as discussed above, the ALJ properly rejected APRN-CNP Johnson's opinion that Mr. G. had a marked limitation in the area of interacting with others. Instead, the ALJ found Mr. G. to be moderately impaired in this area, and it discussed the evidence relevant to that determination—although he had some difficulty getting along with others, the ALJ explained that Mr. G.'s abilities to, for example, teach Tae Kwon Do to children twice weekly and have good/appropriate eye contact and cooperation at examinations showed that he was not more than moderately impaired in this

area.  AR27.  Accordingly, the ALJ properly discounted APRN-CNP Johnson's opinion to the extent it supported marked impairment in the area of interacting with others.

Second, Mr. G. has not shown the ALJ's rejection of APRN-CNP Johnson's opinion that he was markedly impaired in the area of concentrating, persisting or maintaining pace was not supported by substantial evidence in the record.  APRN-CNP Johnson opined that Mr. G. was markedly impaired in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR1078.  APRN-CNP Johnson also indicated that Mr. G. had deficiencies in concentration, persistence or pace that caused him to frequently fail to complete tasks in a timely manner.  AR1077.  These work-related functional abilities relate to the Listing 12.04B area of concentrating, persisting, or maintaining pace.

As discussed herein, the ALJ's determination at step three that Mr. G. had a moderate limitation in the paragraph B area of concentrating, persisting or maintaining pace was supported by substantial evidence in the record.  Notable is the ALJ's mention of the consultative examiner's conclusion that Mr. G.'s attentional capacities were marginal to fair, resulting in some inefficiency in daily functioning but not to an incapacitating degree.  AR16.  Mr. G. has not shown that the opinion of APRN-CNP Johnson that he was

markedly impaired in this area disrupts the ALJ's conclusion that the record indicated only a moderate limitation. Any error in the ALJ's failure to explicitly consider APRN-CNP Johnson's opinion at step three was harmless.

### b. Dr. Richardson

Dr. Richardson submitted a letter dated June 11, 2018, in support of a finding of disability. AR3639-40. Dr. Richardson stated that he felt somewhat limited in quantifying Mr. G.'s physical limitations because he had not treated Mr. G. in the preceding three years. AR3639.

Dr. Richardson's letter offers no opinion of Mr. G.'s physical or mental limitations. For example, the letter contains no assessment of how limited Mr. G. was in any work-related areas. Instead, Dr. Richardson stated that RFC assessments should be ordered to assess Mr. G.'s physical and mental limitations. AR3640.

The ALJ gave Dr. Richardson's letter limited weight because he had not seen Mr. G. since 2015, before his alleged onset of disability. AR27-28. The court agrees with the Commissioner that the ALJ properly assigned Dr. Richardson's statement little value because it offered only the conclusion that Mr. G. was disabled without assessing any element of his functional capacities. See Brown v. Astrue, 611 F.3d 941, 952 (8th Cir. 2010) (treating physician's opinions properly discredited when they merely state conclusion that claimant cannot be gainfully employed; the application of the Social Security Act is a task reserved for the Commissioner).

### c. Dr. Sibson

On September 26, 2018, Dr. Sibson completed a medical source opinion for Mr. G. Dr. Sibson indicated that Mr. G. experiences numerous symptoms related to his diagnosis of bipolar I disorder with psychotic features and anxious distress. AR3673. He opined that Mr. G. was markedly limited in his abilities to understand, remember, and apply information and to adapt and manage himself. AR3674.

Dr. Sibson also opined that Mr. G. was only moderately limited in his abilities to perform mental work-like tasks, including remembering locations and work-like procedures, understanding, remembering, and carrying out simple and detailed instructions, and making simple work-related decisions. AR3674-75. These abilities relate to paragraph B1 of Listing 12.04—the functional ability to understand, remember, and apply information. See 20 C.F.R. 404, Subpt. P, App'x 1, § 12.00E1 (providing examples of relevant abilities to illustrate the nature of this area of mental functioning).

Dr. Sibson also opined that Mr. G. had moderate limitations in his abilities to concentrate, persist, and maintain pace. AR3674-75. Specifically, Dr. Sibson opined that Mr. G. was moderately limited in his abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination and proximity with others without being distracted by them, and to complete a normal workday and workweek without

105

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR3674-75. These abilities relate to paragraph B3 of Listing 12.04—the functional ability to understand, remember, and apply information. See 20 C.F.R. 404, Subpt. P, App'x 1, § 12.00E3 (providing examples of relevant abilities to illustrate the nature of this area of mental functioning).

The ALJ evaluated Dr. Sibson's opinion and afforded it little weight because it was internally inconsistent. AR29. Specifically, the ALJ noted Dr. Sibson's opinions that Mr. G. displayed marked limitations in understanding, remembering, and applying information and in adapting and managing himself, but that Mr. G. had only moderate limitations in his abilities to perform all work-like tasks. AR29. The court agrees with the ALJ's assessment; Dr. Sibson's opinions that Mr. G. is markedly impaired in these two paragraph B criteria and that he is only moderately impaired in the activities that comprise those areas are internally inconsistent. Internal consistency is a well-established criterion for evaluating medical source opinions. See Wagner, 499 F.3d at 850 ("[p]hysician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of the inconsistencies" (quotation omitted)).

The ALJ also found that Dr. Sibson's opinions that Mr. G. was markedly limited in these areas were unsupported by the record in this case. The ALJ noted that Mr. G.'s clinical findings, the results of the psychological consultative examination, his activities of daily living and his work history did

106

not support a finding of marked limitations.  AR29.  The ALJ noted that Mr. G. engaged in substantial gainful activity for six months in 2017, that he cares for his dog by remembering to let it out three times a day, and that he does household chores.  AR29  The ALJ also noted evidence in the record of normal mental status examinations, no inpatient psychiatric treatment, and that Mr. G.'s symptoms were regulated with medication.  AR29.  Evaluating medical opinions based upon their consistency with the record as a whole is proper.  See 20 C.F.R. § 404.1527(c)(4).  Accordingly, the court agrees with the Commissioner that the ALJ's evaluation of Dr. Sibson's opinion was supported by substantial evidence in the record.

### d.    Dr. Ferguson

Mr. G. also asserts that the ALJ improperly rejected the opinion of Dr. Ferguson.  Dr. Ferguson did not render an opinion as to Mr. G.'s mental RFC or any areas relevant to presumptive disability under a Listing.  Instead, during her treatment of Mr. G. in 2016, she administered diagnostic testing.  AR578, 587-91, 606-08, 615-16, 770-71, 764.  The "opinion" Mr. G. asserts the ALJ rejected is the narrative portion of a treatment record.  See Docket No. 35 at p. 16.  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(1).

The treatment record from Dr. Ferguson cited by Mr. G. includes a description of Mr. G.'s diagnostic test results and some discussion of his symptoms. Several of the descriptions of Mr. G.'s symptoms are speculative or equivocal. This is not a medical opinion as that term is defined by Social Security regulations. Accordingly, there was no medical source opinion from Dr. Ferguson for the ALJ to evaluate, and there is nothing for this court to review as to Dr. Ferguson.

### e. Dr. McGrath

Mr. G. asserts the ALJ improperly evaluated the medical source opinion of Dr. McGrath. See Docket No. 21 at p. 16. On August 7, 2018, Mr. G. was seen by Dr. McGrath for a post-hearing psychological evaluation ordered by the ALJ. Dr. McGrath opined that Mr. G. had an extreme limitation in his ability to make judgments on complex work-related decisions and marked limitations in his abilities to understand, remember, and carry out complex instructions. AR3670. Dr. McGrath also opined that Mr. G. had moderate limitations in his abilities to understand and remember simple instructions make judgments on simple work-related decisions. AR3670. Dr. McGrath also opined that Mr. G. had a mild limitation to his ability to carry out simple instructions. AR3670.

Dr. McGrath also offered opinions as to Mr. G.'s functional abilities to interact appropriately with other people and adapt to change. He opined that Mr. G. was moderately impaired in his abilities to interact appropriately with the public and respond appropriately to usual work situations and to changes in a routine work setting. AR3671. Dr. McGrath opined that Mr. G. was mildly

impaired in his abilities to interact appropriately with supervisors and co-workers. AR 3671. Dr. McGrath also noted Mr. G. had a poor capacity to concentrate and difficulty with persistence and pace. AR3671.

Contrary to Mr. G.'s assertion that the ALJ rejected Dr. McGrath's opinion because Mr. G. drove himself to the appointment with Dr. McGrath (see Docket No. 35 at p. 16), the ALJ evaluated Dr. McGrath's opinion and afforded it some weight. AR28. Mr. G. does not assert how the ALJ erred in evaluating Dr. McGrath's medical opinion or why the ALJ's evaluation of Dr. McGrath's opinion was improper. Indeed, Dr. McGrath's opinions related to Mr. G.'s ability to perform work-like tasks is consistent with the RFC's limitation to simple tasks. In the realm of interacting appropriately with others, the RFC followed Dr. McGrath's opinion in limiting Mr. G. to only superficial interactions with co-workers, but included greater limitations than those contained in Dr. McGrath's opinion by limiting Mr. G. to zero interactions with the general public as part of essential job duties.

In the area of concentration, persistence or pace, the ALJ noted that Dr. McGrath opined that Mr. G. had a poor capacity to concentrate. AR29. The ALJ also noted that Dr. McGrath had observed that Mr. G. was able to drive a car and usually does not become lost or confused. From this opinion and the notes accompanying it, the ALJ found Mr. G. was able to concentrate and focus. AR29. It is proper for the Commissioner to evaluate medical opinions based upon their consistency with the record as a whole (see 20 C.F.R. § 404.1527(c)(4)), including information pertaining to Mr. G.'s activities

of daily living.  Therefore, Mr. G. has not shown that the ALJ's assignment of "some weight" to Dr. McGrath's consultative opinion was error.

### f.    Dr. Doorn

Mr. G. asserts the ALJ erred by improperly evaluating the post-hearing consultative opinion of Dr. Doorn which, according to Mr. G., the ALJ rejected because Dr. Doorn did not have a weight set in his office during the evaluation. See Docket No. 35 at p. 15.  This is plainly untrue.  First, the ALJ afforded Dr. Doorn's opinion "some weight."  Second, the ALJ's remark about the absence of weights from Dr. Doorn's office was merely a recitation of Dr. Doorn's own notation that he could not evaluate Mr. G.'s abilities to lift and carry.  AR28, 3651.

As for the other elements of Dr. Doorn's opinion, he opined that Mr. G. could sit for one hour at a time without interruption, stand for eight hours at a time without interruption, and walk for one hour at a time without interruption.  AR3652.  Dr. Doorn also opined that Mr. G. could sit for a total of one hour in an eight-hour workday, stand for a total of eight hours in an eight-hour workday, and walk for a total of one hour in an eight-hour workday. AR3652.  Dr. Doorn opined that Mr. G. was unrestricted in his use of his right hand but, as for his left hand, Dr. Doorn opined that he could never reach overhead, occasionally reach in other directions, frequently handle, and occasionally push or pull.  AR3653.

The ALJ expressly stated that "some weight" was appropriate for Dr. Doorn's opinion because "the opinion is not very precise."  AR28.  This was

because, according to the ALJ, "[t]he sitting, walking, and standing [limitations] account for more than an eight-hour day and indicate that the claimant could stand more than he could sit, which is inconsistent with his allegations about back pain." AR28. Mr. G. asserts no error with this evaluation, and the court finds that the ALJ did not err here.

Mr. G.'s assignment of error evidently concerns the ALJ's ignoring Dr. Doorn's narrow opinion that Mr. G. had limited ability to reach with his left hand. The ALJ did not address this element of Dr. Doorn's opinion in the RFC, but the ALJ referenced it in its narrative discussion at step four. AR28. The crux of this issue is whether that limitation was properly accounted for in the RFC, not whether the ALJ properly evaluated Dr. Doorn's opinion. The RFC issue is addressed in section E.3. herein.

### g. The Vocational Expert

Lastly, Mr. G. asserts the ALJ failed to properly evaluate the opinion of the VE. See Docket Nos. 21 at p. 11 & 35 at p. 15. Mr. G. points to the ALJ's second hypothetical, which included physical limitations consistent with the RFC and mental limitations *beyond those found in the RFC*. Specifically, for purposes of the hypothetical, the ALJ asked the VE to consider a person who could not respond appropriately to interactions with supervisors and could not respond appropriately to routine changes in the work setting. Based upon this hypothetical, the VE testified that such a person would not be employable. AR226-27. Again, the limitations contained in this hypothetical are greater than those found in the RFC. While Mr. G. assigns the VE's answer to the

111

second hypothetical great significance, in reality it carries no significance whatsoever. The VE's answer about the employability of a person whose limitations are greater than those found in the RFC is irrelevant to the issues before the court.

Mr. G. also argues that the ALJ erred by failing to obtain post-hearing testimony from the VE after the consultative examinations by Dr. McGrath and Dr. Doorn. This argument is meritless. At the hearing, the ALJ asked the VE whether a person limited according to Mr. G.'s ultimate RFC (i.e., the RFC the ALJ found at step four) would still be capable of performing work that exists in the national economy. The VE testified that such a person would. The ALJ did not change the limitations it found for Mr. G. based upon the opinions from Dr. Doorn and Dr. McGrath. Therefore, post-hearing testimony from the VE would have been cumulative; the ALJ would have asked the VE to answer questions about a hypothetical individual whose limitations were exactly the same as those contained in the ALJ's first hypothetical from the hearing. Compare AR225 with AR17. As such, the ALJ did not err by failing to obtain post-hearing testimony from the VE.

### 3. Whether the Commissioner's Determination of Mr. G.'s RFC Is Supported by Substantial Evidence

In order to complete step four, the Commissioner must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations. Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004); 20 C.F.R. § 416.945(a)(1). The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records,

observations of treating physicians, and the claimant's own description of their limitations.  Lacroix, 465 F.3d at 887.  The ALJ's RFC finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003) (citation omitted).

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's disability.  20 C.F.R. § 416.945(b) & (c).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000).

When determining RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are non-severe.  Lauer, 245 F.3d at 703; SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence . . . a claimant's residual functional capacity is a medical question."  Lauer, 245 F.3d at 704 (citations omitted).  Therefore, "[s]ome medical evidence . . . must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's

ability to function in the workplace." Id. (citations omitted). Relevant evidence

includes: medical history; medical signs and laboratory findings; the effects of

treatment, including limitations or restrictions imposed by the mechanics of

treatment (e.g., frequency of treatment, duration, disruption to routine, side

effects of medication); reports of daily activities; lay evidence; recorded

observations; medical source statements; effects of symptoms, including pain,

that are reasonably attributable to a medically determinable impairment;

evidence from attempts to work; need for a structured living environment; and

work evaluations. See SSR 96-8p, 1996 WL 374184, at *5.

When writing the RFC, the ALJ "must include a narrative discussion

describing how the evidence supports each conclusion, citing specific medical

facts . . . and nonmedical evidence . . . . In assessing RFC, the adjudicator

must . . . explain how any material inconsistencies or ambiguities in the

evidence in the case record were considered and resolved." Id. at *7.

Finally, "to find a claimant has the [RFC] to perform a certain type of

work, the claimant must have the ability to perform the requisite acts day in

and day out, in the sometimes competitive and stressful conditions in which

real people work in the real world." Reed, 399 F.3d at 923 (quotation omitted,

punctuation altered). RFC is not demonstrated by "the ability merely to lift

weights occasionally in a doctor's office." Juszczyk v. Astrue, 542 F.3d 626,

633 (8th Cir. 2008) (quotation omitted). See also SSR 96-8p, 1996 WL 374184,

at *1 ("RFC is an assessment of an individual's ability to do sustained work-

related physical and mental activities in a work setting on a regular and

continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

As a preliminary matter, Mr. G. raises several generalized complaints about the ALJ's determination of the RFC. He asserts that the ALJ did not consider whether he was able to perform work activities in an ordinary setting on a regular and continuing basis and did not consider his impairments in combination when assessing his RFC. See Docket No. 21 at pp. 21-22. The court rejects that argument. Here, the ALJ expressly recognized that the RFC is an individual's ability to do physical and mental work activities on a sustained basis. AR13. The ALJ stated that the sequential analysis includes consideration of Mr. G.'s impairments or combination of impairments. AR13, 15. The ALJ noted that, in determining the RFC, it "must consider all of the claimant's impairments, including impairments that are not severe." AR13. In reaching its findings, the ALJ considered "the entire record." AR17. This language shows that the ALJ considered whether Mr. G. was able to perform work on a sustained basis and the combined effect of Mr. G.'s impairments in determining Mr. G.'s RFC. See Wilburn v. Astrue, 626 F.3d 999, 1003 (8th Cir. 2010) (when an ALJ states he would perform a duty, it is presumed that the ALJ discharged his duty). Mr. G. has not shown that the ALJ failed to discharge this duty. To the extent Mr. G.'s claim raises specific allegations of impairments that were not considered in the RFC, those arguments are discussed below.

### a. Whether the ALJ Erred in Formulating Mr. G.'s Mental RFC

At step two, the ALJ found Mr. G. had the following severe mental impairments: bipolar affective disorder; personality disorder NOS (not otherwise specified); and borderline intellectual functioning. AR14. The mental RFC determined by the ALJ at step four is as follows: "the claimant is able to perform simple tasks and maintain concentration, persistence and pace for 2-hour work segments. The claimant is able to respond appropriately to brief and superficial interactions with co-workers, but should have no interactions with the general public as a part of essential job duties." AR17. The heart of the issue is whether these limitations adequately express the functional limitations caused by Mr. G.'s mental impairments.

First, Mr. G. asserts the ALJ erred by not expressly discussing his ability to remain on task and to work at a competitive speed. Mr. G. says this is so because SSR 96-8p requires that the "RFC assessment *must* include a discussion of the individual's abilities [in an ordinary work setting on a regular or continuing basis]." See Docket No. 21 at p. 21 (quoting SSR 96-8p, 1996 WL 374184, at *2. Mr. G.'s argument does not touch on the ALJ's RFC finding that Mr. G. can maintain concentration, persistence, and pace for two-hour segments. Indeed, the ALJ repeatedly discussed this area of functioning in its written decision. See AR16, 21, 22, 23, 25, 26, 28. Mr. G. has not shown that the ALJ's discussion of the functional limitations related to his ability to concentrate, persist or maintain pace fell short of established standards.

Similarly, Mr. G. asserts the ALJ erred by failing to consider for purposes of the RFC his pacing and concentration limitations and that he is often "offtask." As discussed at length in this opinion, the ALJ considered Mr. G.'s functional limitation in the area of concentration, persistence or maintaining pace in the course of assessing the various medical opinion evidence and elsewhere in step four of its written decision. The ALJ clearly considered Mr. G.'s functional limitations in this area when determining the RFC. Mr. G.'s assertion that "the ALJ failed to make any factual findings regarding the effect of [his] mental impairments on his ability to work on a sustained basis" (see Docket No. 21 at p. 23) is plainly wrong. The RFC itself provides, "the claimant is able to perform simple tasks and maintain concentration, persistence, and pace for 2-hour work segments," and the RFC limits Mr. G. to simple tasks. AR17. These limitations are the ALJ's findings of the functional limitations of Mr. G.'s mental impairments on his ability to work on a sustained basis.

Second, Mr. G. asserts the ALJ erred because the RFC did not account for his low borderline intellectual functioning. Mr. G.'s allegation of error does not mention that the ALJ found his borderline intellectual functioning to be a severe impairment at step two. The ALJ, in its written decision, clearly addressed the functional effects of this severe impairment: "The record indicates that the claimant has low borderline intellectual functioning. Thus, the undersigned restricted the claimant to simple tasks." AR23. Mr. G.'s emphatic assertions that this impairment was not taken into consideration by the ALJ in determining the RFC is plainly incorrect. And Mr. G. has not

117

asserted that the limitation to simple tasks does not adequately capture the functional limitations caused by his low borderline intellectual functioning. Accordingly, this assignment of error is meritless.

Next, Mr. G. makes the vague assertion that the ALJ erred in failing to consider the combined effect of all his impairments because, according to Mr. G., the ALJ failed to consider his problems sleeping, excessive worrying, feelings of hopelessness and guilt, hallucinations and delusions, and lack of focus and concentration. First, there is no automatic requirement that an ALJ must discuss every impairment, severe or not, found at step two in the RFC at step four. Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). The key question in whether an impairment included in the RFC is whether there is substantial evidence that the impairment actually limits the claimant's ability to work. Id. at 885 (quoting Taylor v. Astrue, Civil Action No. BPG-11-0032, 2012 WL 294532, at *8 (D. Md. Jan. 31, 2012)). Because Mr. G. has not asserted there is substantial evidence that these symptoms actually limit his ability to work, he has not shown that the ALJ failed by not expressly considering them in the RFC.

Additionally, these symptoms are just that—symptoms. They are not impairments, severe or non-severe, or diagnosed conditions that are independently supported by evidence in the record. Mr. G. has put forth no evidence to disrupt the conclusion that these are just symptoms of the severe mental impairments the ALJ found at step two. What's more, the ALJ clearly considered these symptoms in determining the RFC. See AR18 (addressing

Mr. G's feelings of guilt and shame; addressing paranoid feelings and hallucinations), 21 (addressing sleep concerns, excessive worrying, and hallucination/delusional thoughts), 22 (addressing sleep and anxiety issues; addressing clinical findings unremarkable for delusions and hallucinations). Mr. G. has not shown that the ALJ erred by failing to expressly consider these symptoms in the RFC.

Accordingly, Mr. G.'s assignments of error as to the ALJ's finding of the mental RFC are meritless.

### b.  Whether the ALJ Erred in Formulating Mr. G.'s Physical RFC

Lastly, Mr. G. asserts the ALJ erred in failing to consider all the functional limitations caused by his physical impairments in determining the RFC.  The court agrees.

At step two, the ALJ found severe physical impairments of status post clavicle Open Reduction Internal Fixation (ORIF) secondary to fracture; T5 and T6 burst fractures, status post T3-T8 fusion, and obesity.  AR14.  At step four in the RFC, the ALJ found Mr. G. has the following physical limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit for about six hours in an eight-hour workday with the opportunity to stand up and/or change positions for approximately two-three minutes after sitting for an hour, standing and/or walking about six hours in aggregate in an eight-hour workday, never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl, and no

exposure to working around hazards, like unprotected heights or fast and dangerous machinery.  AR17.

Mr. G. asserts the ALJ erred by not including in the RFC any functional limitations associated with the severe impairment of status post ORIF surgery secondary to fracture to Mr. G.'s left clavicle.  As discussed herein, Dr. Doorn opined that Mr. G. had no ability to reach his left hand overhead, limited ability to reach his left hand in other directions, and limited ability to push and pull with his left hand.  AR3653.  Dr. Doorn also found that Mr. G. was unable to adduct his left shoulder and that he was only able to abduct his shoulder to shoulder height.  AR3650.  Dr. Doorn assessed Mr. G.'s left shoulder as having 4/5 strength.  AR3650.  Dr. Doorn also noted that Mr. G. had an abnormal empty can test in the left shoulder.  AR3650.  It is noteworthy that Mr. G. is left-hand dominant.

The ALJ did not address these limitations in any way in the RFC. However, the ALJ mentioned these elements of Dr. Doorn's opinion in its narrative discussion at step four.  Specifically, the ALJ discussed Dr. Doorn's opinion that Mr. G. could never reach overhead, could occasionally reach in all other directions and push/pull, and frequently handle items.  AR28.  The ALJ also noted that Dr. Doorn found that Mr. G. had difficulties with range of motion of his left shoulder.  AR23.  Yet, after considering Dr. Doorn's opinion, the ALJ implicitly found that a light range of work (with no manipulative or range-of-motion limitations) was most consistent with the longitudinal record. AR23, 28.  The ALJ cited as examples that Mr. G. teaches Tae Kwon Do, does

chores, and worked at the level of substantial gainful activity for half of 2017—and he was dismissed from that position due to inappropriate behavior, not because he could not perform his work duties.  AR28.

But the rules governing Social Security decisions are not satisfied if the ALJ merely mentions a medical source opinion before deciding not to adopt it. SSR 96-8p requires the ALJ to "explain why the [medical source] opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *8.  Here, the ALJ did not explain why Dr. Doorn's opinions as to Mr. G.'s range-of-motion and manipulative limitations were not adopted into the RFC.  Although the ALJ explained that it afforded Dr. Doorn's opinion only partial weight because it was not very precise, the ALJ identified imprecision only in the postural limitations.  AR28.  Indeed, Dr. Doorn's opinions as to Mr. G.'s range-of-motion and manipulative limitations are precise.  Further, while the ALJ noted that a light range of work was most consistent with the longitudinal record, this explanation did not address the ALJ's decision to not adopt any of Dr. Doorn's opinions related to range-of-motion and manipulative limitations as to Mr. G.'s left arm.  Accordingly, remand is warranted for the Commissioner to address range-of-motion and manipulative limitations related to Mr. G.'s left arm at step four.

The Commissioner resists this outcome, arguing the ALJ determined the record did not support any limitation or limitations in the use of the left upper extremity.  But nowhere in its written decision did the ALJ expressly make this

finding or explain why it did not adopt Dr. Doorn's medical source opinion to the contrary.

The Commissioner also argues that limitations associated with Mr. G.'s left arm are not warranted because, although he stated that his impairments affected his ability to reach in a December 2020 function report, "he did not amplify his response in any way." <u>See</u> Docket No. 34 at p. 23. The ALJ did not mention this in evaluating the functional limitations in Dr. Doorn's opinion. Additionally, the Commissioner asserts Mr. G.'s testimony at the ALJ hearing undermines his argument that the RFC should have included limitations related to his left arm. At the hearing, Mr. G. testified that he could lift his arm above his head. AR192. The ALJ noted this testimony from Mr. G. at step four (AR18), but it did not mention this testimony when evaluating Dr. Doorn's opinion.

The Commissioner's arguments are improper *post hoc* rationalizations of the ALJ's decision. Therefore, they run afoul of the <u>Chenery</u> doctrine and the court does not consider them.

In <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87-88 (1943), the Supreme Court held that when a court is reviewing an agency decision, the reviewing court is limited to examining agency action on "the grounds upon which the Commission itself based its action." <u>Id.</u> at 88. The Eighth Circuit has interpreted <u>Chenery</u> to stand for the premise that "a reviewing court may not uphold an agency decision based on reasons not articulated by the agency[] when the agency has failed to make a necessary determination of fact or policy

upon which the court's alternative basis is premised." Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) (quotation and brackets omitted). See also Michigan v. EPA, 576 U.S. 743, 758 (2015) (stating it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action."). "Chenery demands that an ALJ provid[e] reasoning behind his determination of fact or policy so that a reviewing court can perform the requisite judicial review." Nills v. Saul, No. 5:18-CV-05079-KES, 2019 WL 6078643, at *5 (D.S.D. Nov. 15, 2019).

The Commissioner's arguments as to why the ALJ did not adopt as part of the RFC Dr. Doorn's opinions as to Mr. G.'s manipulative and range-of-motion limitations are improper after-the-fact rationalizations because the ALJ did not include them as part of its written decision. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself.").

In Burlington Truck Lines, the Supreme Court addressed a similar issue. The Court noted the Administrative Procedures Act allows courts to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power. Id. at 167-68. In order for courts to make this determination, the agency must "disclose the basis of its order." Id. at 168. "The agency must make findings and support its decision,

and those findings must be supported by substantial evidence." Id.  Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision.  Id.  Accordingly, the court in this appeal does not consider rationalizations offered for the first time herein.

Lastly, Mr. G. cites SSR 83-12 for the proposition that a person who has lost use of an upper extremity have the potential occupational base between light and sedentary.  See Docket No. 35 at p. 21.  Mr. G. posits this Social Security Ruling is applicable in this case because he has partially lost the use of his left hand, but this guidance is clearly inapplicable here.  SSR 83-12 concerns the loss of use of an extremity "*because of amputation, paralysis, etc.*" See SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983) (emphasis added).  And the Ruling's meaning behind "partial use" of an upper extremity is qualified by an example contained therein—amputation below the elbow.  Id.  There is no evidence in the record suggesting Mr. G.'s use of his left hand is so limited as to be effectively equivalent to amputation of all or part of his arm or paralysis. This Ruling does not apply to Mr. G.

Because the ALJ did not properly evaluate Dr. Doorn's medical source opinion as to any functional limitations related to Mr. G.'s left arm, remand as to the step four physical RFC determination is warranted.

**F.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Mr. G. requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly

supports such a finding." <u>Buckner</u>, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. <u>Id.</u>; <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. <u>See also</u> <u>Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED July 9, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge